BACM 2001–1 SAN FELIPE ROAD LIMITED PARTNERSHIP; BACM 2001–1 Grayson Drive Limited Partnership; BACM 2001–1 Lejuene Drive, LLC; Wells Fargo Bank, N.A., Trustee; Carol Johnson, Trustee; Kevin Key, Trustee; Jay Jacobs, Trustee; GMAC Commercial Mortgage Corporation; and Lennar Partners, Inc., Appellants

v.

TRAFALGAR HOLDINGS I, LTD., Royal St. Moritz I, Ltd., Lexington Royale, Ltd. and RCA Holdings, Ltd., Appellees.

No. 14–05–00476–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 11, 2007.

James Stephen Barrick, Murry B. Cohen, Russell L. Reid, Houston, for appellants.

Barrett H. Reasoner, Laura Hanley Carlock, Robin C. Gibbs, Samuel William Cruse III, Houston, for appellees.

Panel consists of Justices ANDERSON, HUDSON, and GUZMAN.

## OPINION

EVA M. GUZMAN, Justice.

In this commercial loan dispute, the Borrowers and a related company successfully argued at trial that a group of documents (collectively denominated the "Repayment Agreement") modified the repayment terms of three non-recourse loans, or alternatively, constituted a new contract regarding these loans. On appeal, the Lenders argue that the Repayment Agreement is unenforceable by appellees because it fails to satisfy the Statute of Frauds, or alternatively, the Borrowers breached the Repayment Agreement. The Lenders also challenge the trial court's calculation and allocation of liability for damages. Because we conclude the Repayment Agreement is unenforceable by appellees under either theory advanced, we reverse and render judgment that appellees take nothing.

### I. FACTUAL AND PROCEDURAL HISTORY

Trafalgar Holdings I, Ltd. ("Trafalgar"), Royal St. Moritz I, Ltd. ("Royal"), and Lexington Royale, Ltd. ("Lexington," collectively, "Borrowers") are all owned by RCA Holdings, Ltd. ("RCA"). The three Borrowers share a common ownership form. Ninety-nine percent of each company is owned by RCA, and the remaining one percent is owned by a limited liability corporation that acts as the general partner. The general partner is also owned by RCA.[1] One percent of RCA is owned by Fidelity "S" Corporation, and the remaining ninety-nine percent is owned by Bernard Aptaker.

In March 2001, Bank of America, N.A. ("BOA") made commercial real estate loans to the Borrowers totaling $41.4 million, secured by first lien mortgages on three apartment complexes. The loans included an $11.08 million loan to Trafalgar, secured by a deed of trust on the "Regency Arms" apartment complex in Houston, Texas; a $20.8 million loan to Royal, secured by a deed of trust on the "Royal St. Moritz" apartment complex in Grapevine, Texas; and a $9.52 million loan to Lexington secured by a deed of trust on the "Lexington" apartment complex in Biloxi, Mississippi. Monthly principal and interest payments for the three loans exceeded $277,000. Each of the three Borrowers executed a Loan Agreement, a Promissory Note, and a Deed of Trust (collectively, the "Loan Documents") in connection with its respective loan. Monthly payments were due on the first day of the month, and if not paid by the tenth day, a four percent late charge was added. Any payment more than five days late constituted a default that triggered the Lenders' right to accelerate the loans and foreclose.

BOA transferred the loans to a Real Estate Mortgage and Investment Conduit Trust ("REMIC Trust"). Wells Fargo Bank, N.A. ("Wells Fargo") was the trustee for the REMIC trust and was responsible for distributing income from the loans to investors; GMAC Commercial Mortgage Corporation ("GMAC") was the Master Servicer responsible for day-to-day administration of the loans; and Lennar Partners, Inc. ("Lennar") was the Special Servicer responsible for administering the loans in the event of default (collectively, "Lenders"). Lennar was authorized to modify loans, but was not authorized to make new loans.

---

1. Opteka, L.L.C. ("Opteka") is the general partner in the Lexington and Trafalgar limited partnerships. Opteka is also the sole own-er of Royal Grayson, L.L.C., the general partner in the Royal limited partnership. RCA is the sole owner of Opteka.

On January 13, 2004, GMAC notified the Borrowers that the loans would be declared in default if payment was not received immediately. GMAC did not receive payment, and transferred the loans to Lennar for special servicing. On February 18, 2004, Arden Karson, a senior vice president and asset manager in Lennar's Real Estate Finance and Servicing Group, sent letter agreements, referred to as "pre-negotiation agreements," to each Borrower. Each pre-negotiation agreement contained the following clause concerning modification of the loans:

> The Parties acknowledge and agree that no compromise, consent, release, waiver, or modification agreement or understanding with respect to the Loan or the Loan Documents shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by the authorized representatives of all necessary Parties to any such agreement. The Parties acknowledge and agree that by executing this letter agreement, they are precluded from claiming that any agreement, consent, waiver, release, or modification, oral, express, implied, or otherwise, of the Loan or the Loan Documents, has been effected except in accordance with the terms of this letter. The Parties further acknowledge and agree that no Party is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents.

Bernard Aptaker, owner and chairman of RCA, signed each pre-negotiation agreement on behalf of the respective Borrower and warranted that he had authority to do so.

On March 2, 2004, Lennar declared the three loans in default and demanded payment within ten days. Nevertheless, Karson and Aptaker continued to negotiate and Karson asked Aptaker to submit a proposed solution in writing. On March 23, 2004, Aptaker sent Karson a Proposal which states in pertinent part:

> Pursuant to our telephone discussions last week, I wish to make a proposal for dealing with the outstanding mortgages listed above.
>
> I request that the mortgage holders discount the mortgage balances by 20%, and if the mortgage holders will do so, I will pay the balances less the discount within 4 months, and I will bring the mortgages current immediately. During the 4 months, we will report and apply all operating income to the mortgage debt.
>
> \* \* \* \* \* \*
>
> I believe that the equity of the borrowers in all of the projects has been adversely impacted which will increase unless mold remediation is undertaken immediately. The cost of such remediation must either be paid with additional capital or additional debt. Increasing my capital investment to save my equity doesn't make sense at this time, and it is doubtful that any additional non-recourse debt will be available to cover such costs. However, I am determined to save my investment in these properties if it is feasible and makes sense for me to do so. Without a substantial discount and the ability to refinance the mortgages, my chances of remediating and refinancing the properties will be very difficult.
>
> The mortgage holders alternatively may consider taking back the properties or foreclosing the liens against the properties. However, it occurs to me that the

cost and risk of doing so will exceed the 20% discount that I propose. . . .

Karson telephoned Aptaker on March 25, 2004, but the content of their conversation is disputed. At trial, Aptaker testified that Karson verbally agreed to accept the Proposal if Aptaker would pay $250,000 immediately. According to Karson, Aptaker was to pay $250,000 as a "good faith" payment prior to their face-to-face negotiations scheduled for April 5, 2004. It is undisputed that no payments had been made on any of the three loans since November 2003, and at the time of this conversation, the Borrowers' total arrearage including late fees and default interest totaled approximately $1.98 million.

On March 26, 2004, Aptaker mailed a check for $250,000 to Karson. His cover letter stated:

> With further reference to my letter and proposal of March 23, 2004, I am enclosing our cashier's check in the amount of $250,000 as was agreed upon during your telephone conference call to us of yesterday, March 25, 2004. Please apply it to the 3 loans as you deem appropriate.

The enclosed cashier's check bore the typed notation, "This payment on the captioned loans (see attachment) is in confirmation of your previous acceptance of the agreement contained in our letter of March 23, 2004 (attached)." [2]

Karson was on vacation on March 29, 2004 when the check was received and negotiated by Lennar. After Lennar negotiated the check, Aptaker canceled the meeting scheduled for April 5, 2004.

On April 6, 2004, Lennar sent forbearance proposals to each Borrower regarding its respective loan. Karson called Aptaker on April 14, 2004 to discuss the Lenders' proposed forbearance agreements, and although this conversation is also disputed, none of the parties contends that the Proposal was discussed. On April 23, 2004, Lennar sent revised forbearance proposals to the Borrowers. The Borrowers did not accept any of the proposals or make any further payments.

On April 26, 2004, Lennar sent the Borrowers a notice of intent to accelerate two of the three loans unless payment of sums then due was received by May 3, 2004. On April 28, 2004, the Borrowers wrote to Lennar stating, "As confirmed in our letter dated March 26, 2004, a binding agreement was reached with respect to payoffs of the outstanding loans. . . ." Karson telephoned for an explanation, but her call was not returned. Lennar's counsel also wrote to the Borrowers and received no response. On May 10, 2004, the Lenders sent notice that the Royal St. Moritz property had been posted for foreclosure sale on June 1, 2004.

In response, RCA and the Borrowers filed suit to enjoin the foreclosure and asserted claims for breach of contract and declaratory judgment. They alleged that the Lenders accepted the terms of the Proposal by negotiating the $250,000 check, then repudiated the agreement by sending forbearance proposals and attempting to foreclose on one of the properties. After receiving the petition and reviewing the allegations, the Lenders tendered a refund of the $250,000 payment, which RCA and the Borrowers refused.

On September 10, 2004, Lexington entered into a contract to sell the Lexington apartment complex for $10.75 million, and the buyer tentatively agreed to assume the mortgage. The Loan Documents required the Lenders' approval of any assumption of the loan, but the Lenders did not agree to the assumption because (a) the amount

2. It does not appear from the record that a copy of the Proposal was attached.

of the loan principal was disputed; (b) the amount of past due payments, late fees, and interest the Borrowers would have to pay before the buyer assumed the loan was disputed; and (c) if the trial court agreed with the Borrowers' that the Lenders had accepted the Proposal, then the terms of the Proposal would require immediate payment of the outstanding indebtedness rather than an assumption of the loan. After receiving the Lenders' response, RCA and the Borrowers supplemented their petition to allege that the Lenders wrongfully interfered with the sale of the Lexington property and "will continue to wrongfully interfere" in the sales of the other properties. The Borrowers subsequently contracted to sell the Regency Arms for $13.5 million and the Royal St. Moritz for $22.6 million; however, these sales contracts did not require the buyers to assume the outstanding loans.

Following a bench trial, the trial court ruled in favor of RCA and the Borrowers, ordering Lennar, GMAC, and Wells Fargo to pay them $6,640,222 for the lost benefit of the twenty percent discount; $5,690,011 for lost equity from the prospective sales of the properties; more than $280,855 for prejudgment interest; $300,000 for attorneys' fees through trial; and conditional attorneys' fees of $150,000 for the costs of appeal and review by the Texas Supreme Court.

## II. Issues Presented

In four issues, the Lenders argue that (a) the Statute of Frauds bars enforcement of the alleged Repayment Agreement because it is not in writing, does not include all essential terms of the agreement, and is not signed by the party to be charged; (b)

in the alternative, the Borrowers' own breach of the Repayment Agreement precludes appellees from enforcing it; (c) the evidence is legally insufficient to sustain the award of damages; and (d) the evidence is legally insufficient to sustain a judgment against GMAC because it is not a party to the loans in question and was not involved in the events at issue.

## III. Analysis

### A. The Statute of Frauds

#### 1. Standard of Review

 The trial court's judgment is predicated on its conclusion of law that the Repayment Agreement satisfies the Statute of Frauds. We review the trial court's conclusions of law de novo. *Smith v. Smith*, 22 S.W.3d 140, 149 (Tex.App.-Houston [14th Dist.] 2000, no pet.). When performing a de novo review, we exercise our own judgment and redetermine each legal issue. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex.1998). We will uphold conclusions of law on appeal if the judgment can be sustained on any legal theory the evidence supports. *Waggoner v. Morrow*, 932 S.W.2d 627, 631 (Tex.App.-Houston [14th Dist.] 1996, no writ). Incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. *Id.*

#### 2. Construction of the Repayment Agreement

Appellees argue that the Repayment Agreement is an executory accord that essentially substitutes a new contract for the original Loan Documents.[3] In the alternative, appellees argue that the Repayment Agreement is a modification of the

---

**3.** *But see Pac. Employers Ins. Co. v. Brannon,* 150 Tex. 441, 448, 242 S.W.2d 185, 189 (1951) (distinguishing the law of accord from that of novation, and stating that "a mere accord does not necessarily supersede the original claim. . . .").

original Loan Documents. We address both theories of liability.

### a. The Repayment Agreement as a New Contract

 To satisfy the Statute of Frauds, all loan agreements involving amounts exceeding $50,000 must be in writing. TEX. BUS. & COM.CODE ANN. § 26.02 (Vernon 2002). Specifically, "there must be a written memorandum which is complete within itself in every material detail and which contains all of the essential elements of the agreement so that the contract can be ascertained from the writings without resorting to oral testimony." *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978). The written memorandum must, within itself or by reference to other writings and without resort to parol evidence, contain all the elements of a valid contract, including an identification of both the subject matter of the contract and the parties to the contract. *Dobson v. Metro Label Corp.*, 786 S.W.2d 63, 65 (Tex.App.-Dallas 1990, no writ). In a contract to loan money, the material terms also include the amount to be loaned, the maturity date of the loan, the interest rate, and the repayment terms. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992). Finally, the agreement must be signed "by the party to be bound or by that party's authorized representative." TEX. BUS. & COM.CODE ANN. § 26.02(b) (Vernon 2002).

██ At trial, appellees argued and the trial court agreed that the Repayment Agreement consists of the Proposal, the $250,000 check with its endorsements, and the cover letter accompanying the check. Construing the Repayment Agreement as a new contract and reviewing only these written documents without reference to parol evidence, we are unable to ascertain several essential terms with certainty.

First, we cannot determine the identities of the parties to the Repayment Agreement. Appellees argue on appeal that in the Proposal, RCA promised to bring the loans current immediately and pay off the mortgage balances within four months in exchange for a twenty percent reduction on the mortgage balances. But, the Proposal contains no promises by RCA. Although the Proposal is typed on RCA's letterhead, it is signed "Bernard Aptaker, Chairman of the Board of the General Partner." Our review of the record reveals that RCA's general partner is identified in the original Loan Documents as Fidelity "S" Corporation. Thus, it appears that the promisor is Fidelity "S" Corporation, an entity not named in any of the documents forming the Repayment Agreement.

Moreover, the trial court impliedly found Aptaker to be a party to the agreement, specifically finding that "the promise *by Aptaker*—a nonrecourse borrower—to bring the debt current using in whole or in part *Plaintiffs' personal funds* was new consideration not contemplated by the original agreement between the parties." (emphasis added). This finding of fact is apparently based on the following passage from the Proposal:

> I request that the mortgage holders discount the mortgage balances by 20%, and if the mortgage holders will do so, I will pay the balances less the discount within 4 months and I will bring the mortgages current immediately. . . .

But, Aptaker is not a party to this action, nor does the Proposal require or even mention the use of personal funds. The trial court also allowed recovery to RCA, although RCA is not a party to the original Loan Documents or named as a party in the Repayment Agreement. In sum, it is not clear whether the offer contemplates Aptaker, RCA, or Fidelity "S" Corporation

acting as a guarantor, surety, becoming primarily liable, or simply paying the Borrowers' debt.

The Repayment Agreement's failure to specify the parties to the agreement is not the only critical omission. It is axiomatic that to satisfy the Statute of Frauds, a multimillion dollar loan real estate loan agreement must identify the rate of interest. *See T.O. Stanley Boot Co., Inc.,* 847 S.W.2d at 221. The Proposal contains no mention of interest whatsoever.[4]

By omitting essential terms such as the applicable interest rate and the identities of the parties, the Repayment Agreement, if treated as a new contract, contains insufficient information to satisfy the Statute of Frauds. Although RCA and the Borrowers imply that these omissions are immaterial because an executory accord is not required to satisfy the Statute of Frauds, none of the cases appellees cite concerning executory accord support this proposition. To the contrary, the cases on which appellees rely are distinguishable because they do not address transactions subject to the Statute of Frauds. *See, e.g., Alexander v. Handley,* 136 Tex. 110, 115–17, 146 S.W.2d 740, 742–43 (1941) (concerning an agreement for payment of a disputed sum owed for legal services); *Browning v. Holloway,* 620 S.W.2d 611, 616–17 (Tex.Civ.App.-Dallas 1981, writ ref'd n.r.e.) (concerning a settlement agreement intended to resolve litigation over amounts owed from oil and gas properties). Finally, there is no evidence in the record that Lennar was authorized to enter into new contracts on behalf of BOA, Wells Fargo, or GMAC; the record reveals only Lennar's authority to service and modify existing loan agreements. Thus, if we were to agree with

appellees that the Proposal conveyed the terms of a new contract, we must also agree with appellants that Lennar was not authorized to accept it.

In sum, we conclude the Statute of Frauds bars enforcement of the Repayment Agreement as a new contract and sustain that portion of appellants' first issue. However, appellees' alternative theory of liability characterizes the Repayment Agreement as a modification of the original Loan Documents. We therefore next determine whether the trial court's conclusion that the Repayment Agreement is enforceable can be affirmed by construing the Repayment Agreement as a modification of an existing contract.

### b. The Repayment Agreement as a Modification

A contract required to be in writing cannot be orally modified except in limited circumstances inapplicable here. *See Givens v. Dougherty,* 671 S.W.2d 877, 878 (Tex.1984). Specifically, parties to a written contract that is within the provisions of the Statute of Frauds:

> ... may not by mere oral agreement alter one or more of the terms thereof and thus make a new contract resting partly in writing and partly in parol, the reason for the rule being that, when such alteration is made, part of the contract has to be proven by parol evidence, and the contract is thus exposed to all the evils which the statute was intended to remedy.

*Dracopoulas v. Rachal,* 411 S.W.2d 719, 721 (Tex.1967) (quoting *Robertson v. Melton,* 131 Tex. 325, 115 S.W.2d 624 (1938)). But, a modification to a contract need not restate all the essential terms of the origi-

---

4. We further note that appellees' own evidence and argument suggest that the $250,000 payment was not merely material, but was an essential term. But, no such payment is mentioned in the Proposal, and appellees' explanation for the payment relies on parol evidence.

nal agreement. A modification alters only those terms of the original agreement to which it refers, leaving intact those unmentioned portions of the original agreement that are not inconsistent with the modification. *See Boudreaux Civic Ass'n v. Cox*, 882 S.W.2d 543, 547–48 (Tex.App.-Houston [1st Dist.] 1994, no writ) ("A modification to a contract creates a new contract *that includes the new, modified provisions and the unchanged old provisions.*") (emphasis added). Thus, if we construe the Repayment Agreement as a modification, terms not addressed in the Repayment Agreement are supplied by the original Loan Documents.[5] Because the original Loan Documents supply essential terms missing from the Repayment Agreement, this construction arguably supports the argument that the agreement satisfies the Statute of Frauds.

The Lenders argue that if the Repayment Agreement is a valid modification, it was repudiated or breached by the Borrowers' nonpayment. We therefore address this argument as well.

### B. Breach of Contract

#### 1. Standard of Review

Whether a party has breached a contract is a question of law. *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex.App.-Houston [14th Dist.] 2005, pet. denied); *Trinity Indus., Inc. v. Ashland, Inc.*, 53

S.W.3d 852, 868 (Tex.App.-Austin 2001, pet. denied) ("Where the evidence is undisputed regarding a person's conduct under a contract, the court alone must determine whether such conduct shows performance or breach of a contractual obligation."). We review questions of law de novo, without affording any particular deference to the legal conclusions of the trial court. *Id.*

When a party materially breaches a contract, the other party is discharged or excused from further performance. *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex.2004). Moreover, it is well established that upon the failure of a debtor to perform under an executory accord, the creditor may treat the accord as repudiated and may choose to claim rights under the original cause of action or the accord. *See Alexander*, 136 Tex. at 115–17, 146 S.W.2d at 742–43.[6]

#### 2. Borrowers Breached or Repudiated the Repayment Agreement

The Lenders argue that even if the Repayment Agreement satisfied the Statute of Frauds, it is nevertheless unenforceable by appellees because the Borrowers materially breached the terms of the contract. *See id.* We agree.

The only terms of the original Loan Documents the Proposal purports to modi-

---

**5.** Appellants argue that the Repayment Agreement rests partly in parol because there is no written explanation for the $250,000 check. We will assume for the purposes of this discussion that the payment properly could be treated as a partial payment of the outstanding arrearages under the original Loan Documents, and thus, needed no further written explanation. This is, in fact, how Lennar applied the payment.

**6.** *See also Votzmeyer v. Votzmeyer*, 964 S.W.2d 315, 320 (Tex.App.-Corpus Christi 1998, no pet.) (holding that the nonbreaching party "is

within her rights to choose to enforce the original judgment rather than seek enforcement of the later agreement"); *Browning*, 620 S.W.2d at 616 ("A party could not be expected to exchange what, on its face, is a matured claim capable of accurate determination for an agreement that is not complete in its terms, and which thereby might not resolve all of the issues between the parties. We hold that the agreement is at best an executory accord, and, upon repudiation, a party may sue either upon the accord or upon the underlying cause of action.").

fy are (a) the amount of principal, (b) the maturity date of the loans, and (c) certain accounting requirements. But, the Repayment Agreement does not alter the dates on which principal and interest payments are due; contains no mention of the treatment of late fees and default interest that had already accrued under the original Loan Documents; and does not address the pre-payment penalties that would be assessed under the original Loan Documents.[7] Appellees contend that the Proposal excludes these costs because they "had no intention of paying them—they simply were not part of the deal." This position ignores the undisputed fact that these past and future penalties are part of the original Loan Documents, and the Proposal contains no request to modify these provisions of the original agreements. These terms are not inconsistent with those set forth in the proposed Repayment Agreement; therefore, these provisions are incorporated into the modification. *See Boudreaux Civic Ass'n,* 882 S.W.2d at 547–48. Thus, even if the Repayment Agreement satisfied the Statute of Frauds, the Borrowers did not perform their obligations and never intended to do so.

Appellees argue that payment of a $7.5 million prepayment penalty, previously accrued late fees, and enhanced interest would defeat the purpose of the proposed modification, and hence, were not incorporated into the Repayment Agreement because these provisions are inconsistent with the terms of the Proposal. We disagree. The Borrowers would not incur a prepayment penalty unless the loans were prepaid before the maturity date. By accelerating the maturity date to a date only four months away, the Borrowers would not incur prepayment penalties unless the loans were prepaid in less than four months. Accordingly, the Borrowers could forego years of future interest payments without penalty. Additionally, the value of the twenty percent reduction in principal substantially exceeds the amount of previously accrued late fees and enhanced interest that were required to be brought current immediately.

Appellees' refusal to pay late fees and enhanced interest is not the only example of their nonperformance. Under the terms of Proposal, the Borrowers (and possibly Aptaker, RCA, or Fidelity "S" Corporation) agreed to bring the arrearages current "immediately." In interpreting this provision, we give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense. *Heritage Res., Inc. v. Nations-Bank,* 939 S.W.2d 118, 121 (Tex.1996). "Immediately" means "without interval of time, without delay, straightway, or without any delay or lapse of time." BLACK'S LAW DICTIONARY 750 (6th ed.1990); *see also* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 601 (9th ed.1991) (defining "immediately" as "without interval of time; straightway"). On the facts before us, the offer to bring the loans current "immediately" meant, at a minimum, that the Borrowers would not allow the arrearages to increase and payments to be delayed to the point that the Lenders had grounds to foreclose under the terms of the original Loan Documents that remained in force. However, the Borrowers did not bring the arrearages current "immediately." The Lenders were not paid by the time the next payment was due on April 1, 2004; moreover, the Lenders were not paid within five days of the due date, even though any payment more than five days late was a default that triggered the Lenders' right

7. Under the original Loan Documents, the prepayment described in the Repayment Agreement would result in penalties of approximately $7.5 million.

to accelerate the loans and foreclose.[8] Because the Lenders did not receive the April payment by that date, a new default condition arose.[9] The Borrowers also did not bring the loans current or make the April payment within ten days of the due date, thereby triggering enhanced interest charges of an additional four percent and causing the total amount of the arrearages to increase still further. In fact, it is undisputed that the Lenders never received another payment after endorsing the $250,000 check that purportedly confirmed the Repayment Agreement. As previously discussed, the Borrowers never intended to bring the total arrearages current, because they did not intend to pay the previously accrued late fees or the enhanced interest payments at all.

The trial court's findings of fact and conclusions of law suggest the trial court concluded that the Repayment Agreement incorporated only those terms from the original Loan Documents that are specifically mentioned in the Proposal, and applied a more elastic definition of the word "immediately." However, if the Repayment Agreement was intended to completely replace the original Loan Documents, it is unenforceable because it does not satisfy the Statute of Frauds. In order to supply missing essential terms, the Repayment Agreement—including the word "immediately"—must instead be interpreted as a modification of the original Loan Documents and read in conjunction with them. Under the Loan Documents, payments are due on the first of the month. If payments are not made by the

fifth of the month, the Borrower is in default and the Lenders have the right to begin foreclosure proceedings. Therefore, "immediately" cannot reasonably be construed to mean a date later than the date of default.

On the record before us, we hold that the Lenders were entitled to treat the Repayment Agreement as repudiated, and to pursue remedies for default under the original Loan Documents. *See Alexander,* 136 Tex. at 115–17, 146 S.W.2d at 742–43. These remedies included the right to pursue the non-judicial foreclosure sale that triggered this lawsuit.

Interpreting the Repayment Agreement as a contract modification, we sustain the Lenders' second issue. Because our disposition of the Lenders' first two issues requires us to reverse and render judgment that appellees take nothing, we do not reach the Lenders' remaining arguments and issues.

## IV. CONCLUSION

For the foregoing reasons, we reverse and render judgment that appellees Trafalgar Holdings I, Ltd., Royal St. Moritz I, Ltd., Lexington Royale, Ltd. and RCA Holdings, Ltd. take nothing.

---

**8.** These critical dates were not modified or even mentioned in the Proposal; thus, they remained in effect.

**9.** Although the Repayment Agreement required the Borrowers to "report and apply all operating income to the mortgage debt," there is no evidence in the record that the Borrowers performed this obligation by the

first of the month, the fifth of the month, or at any other time. Thus, even if we interpreted the Repayment Agreement as allowing the Borrowers additional time to pay the arrearages that had already accrued, we are still confronted with the Borrowers' failure to make current payments as they became due.