# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00101-CV

**DPRS 15th Street, Inc.; Cliff Woerner, Individually and d/b/a/ Woerner Interests; and Gail Woerner, Appellants**

**v.**

**Texas Skyline, Ltd.; Skyline Interests, LLC; and Pecos & 15th, Ltd., by and through Skyline Interests, LLC, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. D-1-GN-09-000825, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

DPRS 15th Street, Inc.; Cliff Woerner, individually and d/b/a Woerner Interests; and Gail Woerner (sometimes collectively Woerner) appeal the trial court's judgment awarding damages and attorney's fees to Texas Skyline, Ltd.; Skyline Interests, LLC (sometimes jointly Skyline); and Pecos & 15th, Ltd., by and through Skyline Interests, LLC, on their claims for breach of a limited partnership agreement and breach of fiduciary duties. For the reasons that follow, we affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

**Formation of Partnership**

In 2006, Cliff Woerner solicited capital investments to construct a building in Amarillo, Texas, so that it could be leased to the State of Texas and ultimately sold. Woerner, who

had experience with building and leasing properties to the State, approached Mark Reinking, who brought in Dennis Ferstler and Dan Kellogg as investors, and the four began discussions concerning the formation of a limited partnership for that purpose, later named Pecos & 15th, Ltd. (Pecos). In late October 2006, Woerner presented a "Project Pro Forma" estimating a project cost of approximately $3.5 million. The parties agreed that Kellogg and Ferstler would contribute $665,000 in capital and the partnership would obtain a bank loan in the amount of $2.8 million. They also agreed that Woerner would own a 50% interest,[1] Kellogg and Ferstler a 40% interest,[2] and Reinking a 10% interest and that Kellogg and Ferstler would receive a monthly investment return of $5,126 and the return of their capital contribution before any distributions were made to other partners. DPRS, controlled solely by Woerner, was to act as general partner. Woerner was to arrange the deal, manage the construction, and lease the property to the State, and in exchange for his services, he was to receive a monthly "partnership management fee." An early draft of the partnership agreement proposed by Woerner contained a provision that he receive an additional "construction management fee," but that provision was stricken from all subsequent versions.

In December 2006, the parties executed the partnership agreement,[3] Texas Skyline paid its $665,000 capital investment, and Pecos obtained a $2.8 million loan, guaranteed by

---

[1] Woerner ultimately received a 49.99% interest, and DPRS, a corporation controlled solely by Woerner, received a .01% interest.

[2] As explained below, Ferstler and Kellogg later decided to participate in the partnership through Texas Skyline, Ltd., a limited partnership formed for that purpose.

[3] In the trial court, Woerner disputed the validity of the partnership agreement, alleging that he had not signed the same version of the agreement that the other partners signed, but he does not raise that issue on appeal.

2

Woerner. In January 2007, Woerner hired Hal Webb, ALCO Builders to act as construction manager on the project for a fee of $165,000 plus a bonus of 25% of the amount saved if Webb completed the project for less than the agreed cost of $2.75 million. During construction, Woerner presented applications for payment to the bank and withdrew the entire amount of the $2.8 million loan. The building was completed in September 2007.

**The Parties' Dispute**

In October 2007, Warner provided the first accounting (the Budget Final) and made the first distributions to Texas Skyline, Reinking, DPRS, and himself. Disagreements arose over the distributions and several items included in the Budget Final. Ferstler and Kellogg observed that the distributions made to Reinking, DPRS, and Woerner were incorrect because, according to the partnership agreement, Texas Skyline was to receive a monthly investment return of $5,126 and the return of its capital contribution before any distributions were made to other partners. Ferstler and Kellogg also observed that the projected costs and the actual costs stated in the Final Budget were identical to the penny. Further, they noted entries for $112,000 and $375,000 in expenses that they could not identify. In subsequent discussions, Woerner stated that he had hired Webb and paid him a bonus of $112,000 for completing the project under budget. He also stated that he had withdrawn $375,000 in funds as a loan to himself or as "draws against sales profits" and agreed to pay one-half of it back.[4] Texas Skyline sent a letter to Woerner reserving the right to remove the general partner

---

[4] Woerner testified that his reasoning was that he would need to repay only one-half of the amount because of his 50% interest in Pecos. The record reflects that Woerner did not repay any of the $375,000, and the entire amount remains in dispute.

3

under the terms of the partnership agreement, pointing out that under the partnership agreement no partner had the right to withdraw funds and there was a prescribed order for distributions, and requesting that he engage Reinking as property manager and deliver the partnership records to him. In his response, Woerner stated that he had discussed the withdrawal of funds with Reinking, who had agreed to discuss it with Kellogg and Ferstler, and having heard nothing further, he had assumed that they had consented. He also stated that his experience made him more suited to be property manager and he would continue in that role.

In December 2008, Woerner notified the other partners that the partnership had insufficient funds to make an end-of-year tax payment and that in lieu of a cash call, he was forgoing January distributions. In January 2009, Texas Skyline executed a unanimous written consent removing DPRS as general partner and naming as general partner Skyline Interests, LLC, the general partner of Texas Skyline. Texas Skyline informed Woerner of his removal and requested that he turn over the partnership books. Woerner "rejected" Texas Skyline's "unilateral decision" and stated that the records were available for review but would stay with him. Texas Skyline and Reinking attempted to sell the building but were unsuccessful.

**Litigation Commenced**

In March 2009, Skyline and Pecos filed suit against Woerner asserting various causes of action including breach of the partnership agreement and breach of fiduciary duties and seeking injunctive relief. Following a hearing, the trial court entered a temporary injunction prohibiting Woerner and DPRS from acting as general partner and requiring them to deliver the partnership records and any remaining partnership funds to Skyline Interests, as the new general partner. The

4

temporary injunction also prohibited any party from using Pecos funds to pay attorney's fees. Upon review of the records and in subsequent discovery, Skyline and Pecos learned that, in addition to the loan, Woerner had paid Woerner Interests $125,000 in fees for acting as the general contractor on the project plus $185,000 in overhead and had made additional transfers of Pecos funds into his personal accounts. Skyline and Pecos amended their petition to seek monetary damages.

In an April 2010 bench trial, Woerner's withdrawals of funds were undisputed; instead, the controversy centered on whether the withdrawals violated the terms of the agreement and Woerner's fiduciary duties as partner. The trial court heard the testimony of the partners; Roy Neardick, controller of Skyline Interests and accountant for Pecos at the time of trial; and David Sefton, an accountant who prepared the 2007 tax return for Pecos. Ferstler testified that he first learned Woerner had taken a loan or "draws against sales profits" in October 2007 and had become aware of the general contractor fees, overhead payments, and other transfers only through discovery after Skyline and Pecos filed suit. He stated that the partners had agreed to pay Woerner a management fee, which was not in dispute, but that they had never discussed additional fees or draws and Woerner had never asked for a loan, general contractor fees, or overhead. He also testified that Woerner had included a provision that he receive a construction management fee in the first draft of the agreement, but Texas Skyline struck it immediately.

Reinking testified that the "deal points" agreed to by the partners that formed the basis of the partnership agreement did not include provisions for Woerner to receive contractor fees, overhead, or a loan and that Woerner agreed to delete the provision in the first draft of the partnership agreement providing for payment of a construction management fee to Woerner. He also

5

testified that when Woerner approached him with the idea of taking a loan as a way of getting tax-free money, he told Woerner that he did not think it made sense or would work and he did not agree to the loan.

Neardick testified that he had reviewed financial records including the Pecos bank statements and check registry, the bank statements and check registries for Woerner's personal accounts, and the Woerner Interests checkbook registry. According to Neardick, the records reflected that Woerner transferred $721,031.51 from the Pecos account into his personal and Woerner Interests accounts between December 2006 and October 2007 and made distributions from the Pecos account to Woerner, DPRS, and Reinking in the net amount of $112,966.98 between October 2006 and April 2009, for total withdrawals of $833,998.46. Neardick also testified that Woerner obtained a bank loan for a home addition but appeared to use the loan funds for other expenses and paid personal bills, including payments toward the addition to his home, from the Woerner Interests account.

Woerner testified that he discussed the loan from Pecos with Reinking, asked him to get the other partners' reactions, and did not hear back and that Reinking had therefore given "tacit consent" to his drawing against the sales profits and repaying it by means of an offset against his share of the profits at the sale of the building. He also testified that the loan complied with the terms of the partnership agreement because it was on the same terms as any third-party contract would have been except that if it had been with a third party, he would have put it in writing.

Regarding his decision to act as general contractor, Woerner testified that the lowest bid he received would have required the partners to contribute an additional $1,000,000, so he

decided to use his general contracting firm to save Pecos money. He stated that as general partner of Pecos, he had executed a "stipulated sum contract"[5] with Woerner Interests to act as general contractor for $125,000,[6] signed the contract for both sides in October 2007, and backdated it to April 2007. He also testified that he earned his 50% interest through development work prior to obtaining bids on the project—not through handling the construction—and he had assumed his partners knew he was going to enter a stipulated sum contract with the partnership for the construction. He stated that he made draw requests from the bank in amounts greater than actual costs because that is "part of the way the stipulated sum contract works." Woerner also testified that he had no records showing his actual costs or expenses and did not know how he calculated the $185,000 in overhead fees but that it is not standard in the industry to provide overhead receipts.

Sefton testified generally concerning his preparation of Pecos's 2007 tax return and his conversations with Reinking regarding how to classify Woerner's withdrawals of $375,000. He stated that Reinking instructed him to report it in the way most favorable to Ferstler and Kellogg and that the loan did not cause any harm to Pecos as long as Woerner paid it back. He also stated that

[5] Woerner explained that a "stipulated sum contract" is one under which the contractor takes the risk of completing the project within the sum stipulated in the contract. If the cost of the project exceeds the stipulated sum, the contractor must pay the excess. If the contractor completes the project for less than the sum, he receives the difference between the stipulated cost and the actual cost.

[6] Woerner's testimony was inconsistent on the question of how much was owed to Woerner Interests for general contracting services. At times he stated that Pecos owed Woerner Interests the $125,000 specified in the contract, and at other times he stated that Woerner Interests was entitled under the stipulated sum contract to whatever amount of the $2,800,000 loan was not used. As previously discussed, the evidence showed that Woerner withdrew from the bank the entire $2,800,000 loan and withdrew from Pecos amounts in addition to the withdrawals for the loan, general contractor fees, and overhead.

7

he had the impression that Woerner would be paid for constructing the building but never participated in any discussions regarding contractor's fees and overhead. Sefton further testified that he and Woerner had been friends since 2005 and were "pretty good friends."

Following trial but before the trial court rendered judgment, Woerner filed for bankruptcy. The bankruptcy court entered an order modifying the automatic stay, allowing the case to proceed to judgment. The trial court rendered judgment awarding actual damages in the amount of $833,998.46 to Pecos and attorney's fees to Pecos and Texas Skyline, removed DPRS as general partner, and named Skyline Interests as successor general partner. The trial court issued extensive findings of fact and conclusions of law. This appeal followed.

## STANDARD OF REVIEW

"In an appeal from a bench trial, a trial court's findings of fact and conclusions of law 'have the same force and dignity as a jury's verdict upon questions.'" *Seasha Pools, Inc. v. Hardister*, 391 S.W.3d 635, 639 (Tex. App.—Austin 2012, no pet.) (quoting *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991)). Unchallenged findings of fact are binding unless there is no evidence to support the finding or the contrary is established as a matter of law. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *McAleer v. McAleer*, 394 S.W.3d 613, 620 (Tex. App.—Houston [1st Dist.] 2012, no pet.). In a bench trial, the trial judge passes on the witnesses' credibility and the weight to be given their testimony and can accept or reject any witness's testimony in whole or in part. *Bocquet v. Herring*, 972 S.W.2d 19, 22 (Tex. 1998). The trial court may believe one witness, disbelieve others, and resolve inconsistencies in any witness's testimony. *McGalliard*, 722 S.W.2d at 697; *Seasha Pools*, 391 S.W.3d at 639. We may not

8

substitute our judgment for that of the trier of fact merely because we reach a different conclusion. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988); *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.—Austin 1992, no writ).

We review a trial court's conclusions of law de novo and will uphold the conclusions if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Hawkins v. Ehler*, 100 S.W.3d 534, 539 (Tex. App.—Fort Worth 2003, no pet.). Although a trial court's conclusions of law may not be challenged for factual insufficiency, we may review the legal conclusions drawn from the facts to determine their correctness. *City of Austin v. Whittington*, 384 S.W.3d 766, 779 n.10 (Tex. 2012); *BMC Software*, 83 S.W.3d at 794. We may reverse a trial court's judgment only if its conclusions are erroneous as a matter of law. *Condom Sense, Inc. v. Alshalabi*, 390 S.W.3d 734, 749 (Tex. App.—Dallas 2012, no pet.); *Thomas v. Cornyn*, 71 S.W.3d 473, 485 (Tex. App.—Austin 2002, no pet.).

## DISCUSSION

In his first issue, Woerner argues that the trial court erred in holding that he breached the partnership agreement. In sub-issues, Woerner challenges three aspects of the trial court's holding as to breach of contract.[7] We address each sub-issue in turn.

---

[7] Woerner argues his first issue as one of contract construction. However, the issue does not turn on interpretation of the partnership agreement. Rather, it requires us to apply the undisputed terms of the agreement to Woerner's undisputed conduct to determine the correctness of the trial court's conclusions that Woerner breached the agreement. *See City of Austin v. Whittington*, 384 S.W.3d 766, 779 n.10 (Tex. 2012); *BACM 2001-1 San Felipe Rd. Ltd. P'ship v. Trafalgar Holdings I, Ltd.*, 218 S.W.3d 137, 146 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *Trinity*

9

**Contractor's fees and overhead**

In sub-issue 1-A, Woerner contends that the trial court erroneously held that he breached the partnership agreement by paying himself general contractor's fees and overhead. Among the trial court's conclusions of law related to Woerner's payments to himself for contractor's fees and overhead were that Woerner breached: (1) section 2.6 of the partnership agreement, which prohibited any partner from receiving any "interest, salary, or drawing . . . for services rendered on behalf of the Partnership or otherwise in his capacity as a Partner, except as otherwise authorized in . . . this Agreement";[8] (2) section 5.3(a)(vii), which prohibited any partner, without the consent of Texas Skyline, from entering into "any contract, agreement, . . . or other arrangement for the furnishing to or by the Partnership of . . . services . . . with any party or entity related to or affiliated with the General Partner or with respect to any entity which the General Partner has any direct or indirect ownership or control unless . . . authorized by section 5.6 . . . . ";[9] and (3) section 5.6(a), which provided that "[e]xcept as otherwise provided in this Section 5.6,[10] no Partner shall receive any salary, fee, or draw for services rendered to or on behalf of the Partnership."

Although Woerner does not challenge specific conclusions of law, he argues that the contractor fees and overhead need not be authorized under section 5.3 or section 5.6 because they were not payments to a partner for services to the partnership but were legitimate expenses of the

*Indus. v. Ashland, Inc.*, 53 S.W.3d 852, 868 (Tex. App.—Austin 2001, pet. denied).

[8] Section 5.6 (b) provided that Woerner was to receive a partnership management fee, which he received and which is not in dispute on appeal.

[9] *See supra* n.8.

[10] *See id.*

partnership authorized by section 5.1 and paid to Woerner Interests, a nonpartner. However, the trial court issued numerous findings of fact related to the contractor fees and overhead, including findings that Woerner transferred more than $817,000 in funds from Pecos's account to his personal and Woerner Interests accounts for his own personal use and not for services or for overhead. The trial court also issued findings that the other partners did not authorize or consent to a contract with Woerner Interests or to contractor's fees or overhead and Woerner did not disclose the contract or transfers for contractor's fees and overhead. The trial court further found that Woerner contracted with Webb/ALCO Builders to act as construction manager, Webb managed and supervised the construction, and Woerner paid Webb/ALCO Builders for his services, including a performance bonus. Because Woerner does not challenge these findings, they are binding on this Court unless the contrary is established as a matter of law or there is no evidence to support the findings. *See McGalliard*, 722 S.W.2d at 696; *McAleer*, 394 S.W.3d at 620.

A review of the record demonstrates that there is evidence to support these unchallenged findings. Woerner testified that, as general partner of Pecos, he entered into an "oral contract" with Woerner Interests, his sole proprietorship, to act as general contractor and that he executed a written agreement in October 2007—around the time Ferstler testified that he and the other partners learned of the loan—signed it on behalf of both parties, and backdated it. Ferstler and Reinking testified that Woerner did not disclose the contract and that they did not authorize the contract or the fee and overhead payments to Woerner, and Woerner testified only that he had "assumed" that they knew he would enter the contract. It was undisputed that Woerner contracted with Webb, who performed the duties of contraction manager, for which Woerner paid him.

11

Neardick testified and produced exhibits based on Woerner's records showing that Woerner transferred more than $817,000 in Pecos funds to his personal, Woerner Interests, and DPRS accounts and spent funds from those accounts on personal expenses including his home addition.[11] Woerner produced no receipts as evidence of his overhead expenses and could not explain how he calculated his overhead fees.

Because there is some evidence in the record to support the trial court's unchallenged findings, they are binding. *See McGalliard*, 722 S.W.2d at 696; *McAleer*, 394 S.W.3d at 620. Further, these findings support the trial court's conclusions that Woerner breached the partnership agreement by orally contracting with and purporting to pay himself fees for services and overhead without the consent or knowledge of Texas Skyline. Thus, we cannot conclude that the findings are erroneous as a matter of law. *See Condom Sense*, 390 S.W.3d at 749; *Thomas*, 71 S.W.3d at 485. We overrule issue 1-A.

**Loan**

In sub-issue 1-B, Woerner argues that the trial court erred in holding that he breached the partnership agreement by loaning himself money from Pecos funds. The trial court issued a conclusion of law that Woerner breached section 5.3(a)(iv) of the partnership agreement, which prohibited the general partner from lending Pecos funds to the general partner or any limited partner unless it was loaned under the same rates and payment terms that would be required of an

---

[11] Of the $112,966.98 in distributions that Neardick testified Woerner made, $16,668.75 was distributed to Reinking. The remainder of the distributions were made to DPRS and Woerner, and when added to the transfers made to Woerner and Woerner Interests resulted in a total of $817,329.71 in distributions and totals to DPRS, Woerner, and Woerner Interests.

independent third party—unless Texas Skyline consented to a loan on other terms. Woerner contends that the loan he made to himself was on the same terms and conditions as those under which he would have loaned money to any other party. However, the trial court found that Woerner did not disclose the loan or any terms or produce any contract or loan documents between himself and Pecos and that the other partners did not authorize or consent to the loan, and we conclude that these findings are supported by the record evidence.

Ferstler testified that Woerner never asked for any draws or a loan and that he first learned of the loan in October 2007. Reinking testified that although Woerner asked him about withdrawing some money "tax free," he did not agree to or authorize the idea, and Woerner testified that by not getting back to him, he believed Reinking gave "tacit" approval. The only evidence of any terms of the loan was Woerner's testimony that he orally agreed with himself as general partner to pay the loan back at eight and a half percent, and Woerner conceded that if he had loaned Pecos funds to a third party, he would have entered into a written loan agreement. Here, the trial court, acting as factfinder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony and could have believed Ferstler and Reinking and disbelieved Woerner's testimony that he orally established loan terms. *McGalliard*, 722 S.W.2d at 696; *Seasha Pools*, 391 S.W.3d at 639. Thus, we conclude that the evidence supports the trial court's unchallenged findings concerning the loan, and consequently they are binding on this Court. *See McGalliard*, 722 S.W.2d at 696; *McAleer*, 394 S.W.3d at 620. Because these findings support the trial court's conclusion that Woerner breached the partnership agreement by orally agreeing to loan himself Pecos funds without stated terms that would have been required of a third party and without the consent of Texas Skyline,

13

they are not erroneous as a matter of law. *See Condom Sense*, 390 S.W.3d at 749; *Thomas*, 71 S.W.3d at 485. We overrule issue 1-B.

**Distributions**

In issue 1-C, Woerner contends that the trial court erred in holding that he breached the partnership agreement by distributing profits to himself and Reinking. The trial court issued conclusions of law that Woerner breached section 1.8(n) of the partnership agreement by failing to pay Texas Skyline its required monthly investment return of $5,126 from January 2007 through September 2007 and section 4.1 by making distributions to himself and to Reinking before Texas Skyline received its unpaid investment return and unreturned investment capital. Section 1.8(n) defined "Investment Return" with respect to Texas Skyline as $5,126 per month beginning in January 2007 and continuing until the sale of the property. Section 4.1 prohibited distributions to Woerner and Reinking until Texas Skyline received all accrued "Unpaid Investment Return" and "Unreturned Investment Capital."[12]

The trial court issued findings of fact that Woerner acknowledged Texas Skyline's capital contributions of $665,000 and that Texas Skyline did not receive all of its unpaid investment returns or any of its unreturned investment capital. Woerner contends that there was no unpaid investment return because Texas Skyline always received its monthly investment return and cites to

---

[12] Section 1.8(ae) defined "Unpaid Investment Return" as "return of capital, which means, with respect to [Texas Skyline], its accrued but unpaid Investment Return." Section 1.8(af) defined "Unreturned Investment Capital" as Texas Skyline's capital contributions to the Partnership "less the cumulative amount of cash and the Gross Asset Value of Partnership Property distributed by the Partnership to [Texas Skyline] pursuant to [the partnership agreement].

copies of checks to Texas Skyline contained in Exhibit 45. However, Exhibit 45 reflects monthly checks payable to Texas Skyline in the amount of $5,126 beginning in October 2007 while the partnership agreement called for payments to begin in January 2007. In addition, Ferstler testified that Texas Skyline did not begin receiving checks for its monthly investment return until October 2007. This evidence supports the trial court's finding that Texas Skyline did not receive all of its monthly investment return.

Regarding the return of investment capital, Ferstler testified that Texas Skyline did not receive any of its $665,000 investment, and this uncontradicted evidence supports the trial court's finding to that effect. The evidence also established that Woerner paid distributions to himself and Reinking before Texas Skyline received its unpaid investment return and unreturned investment capital.[13] Because there is some evidence in the record to support these unchallenged findings, they are binding on this Court. *See McGalliard*, 722 S.W.2d at 696; *McAleer*, 394 S.W.3d at 620. Further, these findings support the trial court's conclusion that Woerner breached the partnership agreement by failing to pay Texas Skyline its required monthly investment return of $5,126 from January 2007 through September 2007 and making distributions to himself and to Reinking before Texas Skyline received its unpaid investment return and unreturned investment capital. Thus, the findings are not erroneous as a matter of law. *See Condom Sense*, 390 S.W.3d at 749; *Thomas*, 71 S.W.3d at 485.

---

[13] As to the distributions to Woerner and Reinking, Woerner argues that Texas Skyline has not lost any money except the early use of the money distributed to the other partners because Texas Skyline should receive the money owed upon liquidation of the partnership. However, even if this were true, whether the distributions could have been accomplished in a different manner is irrelevant to the question of whether the agreed terms regarding distributions were breached.

15

Woerner also argues that Texas Skyline ratified the distributions by accepting the benefits of its own distributions after notification that Woerner was making distributions to himself and Reinking. Skyline and Pecos contend that Woerner failed to assert ratification in the trial court and has therefore waived this argument. Ratification is an affirmative defense that is waived unless affirmatively pleaded. *See* Tex. R. Civ. P. 94; *Land Title Co. of Dallas v. F. M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex. 1980); *Missouri Pac. R.R. Co. v. Lely Dev. Corp.*, 86 S.W.3d 787, 791 n.4 (Tex. App.—Austin 2002, pet. dism'd). However, a party need not plead a cause of action with specificity if it can reasonably be inferred. *Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex. 1993); *Lely Dev. Corp.*, 86 S.W.3d at 791 n.4 (citing *McNeil v. Nabors Drilling USA, Inc.*, 36 S.W.3d 248, 250 (Tex. App.—Houston [1st Dist.] 2001, no pet.)) (applying specificity analysis to affirmative defense of ratification). Appellate courts should not infer a cause of action unless the petition gives fair notice of that cause of action. *See Boyles*, 855 S.W.2d at 601. "'A [pleading] is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim.'" *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 897 (Tex. 2000) (quoting *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982)).

In his live pleading, Woerner did not allege ratification but asserted the affirmative defense of estoppel in a single sentence: "Plaintiffs' claims are barred by estoppel from asserting their claims [sic]."[14] It cannot be reasonably inferred from that single sentence, absent any

---

[14] In a prior pleading, Woerner asserted a claim of estoppel as to funds paid to Woerner for the development and construction, claiming that Skyline's and Pecos's acceptance of the construction and development of the project prevented their claim for return of such funds. Concerning distributions, Woerner alleged in the same prior pleading that the parties had agreed to change the distribution method so as to eliminate the preferred distributions to Texas Skyline. These

16

supporting factual allegations, that Woerner intended to assert the defense of ratification as to the distributions to Woerner and DPRS, and the pleading did not afford Skyline and Pecos fair notice and the opportunity to defend against that claim. *See Auld*, 34 S.W.3d at 897 (must be fair and adequate notice of facts underlying claim); *SmithKline Beecham v. Doe*, 903 S.W.2d 347, 354 (Tex. 1995) (claim for negligent misrepresentation could not be inferred from negligence and tortious interference claims because no reference to misrepresentations); *Boyles*, 855 S.W.2d at 601 (allegations of gross negligence in support of punitive damages claim did not provide fair notice of claims for "grossly negligent" infliction of emotional distress);[15] *cf. Lely Dev. Corp.*, 86 S.W.3d at 791 n.4 (sufficient notice where defendant alleged that, based on past actions of plaintiff under contract, plaintiff should be estopped from denying any duty under contract to provide defense and immunity). Therefore, Woerner has waived this argument. *See* Tex. R. App. P. 33.1; *In re A.D.A.*, 287 S.W.3d 382, 390 (Tex. App.—Texarkana 2009, no pet).

Even if Woerner had not waived his claim of ratification, we would conclude that it is inapplicable on these facts. "Ratification occurs if a party recognizes the validity of a contract by acting or performing under the contract or by otherwise affirmatively acknowledging it." *Lely Dev. Corp.*, 86 S.W.3d at 792 (citing *Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 547 (Tex. App.—Austin 1999, pet. denied); *Fowler v. Resolution Trust Corp.*, 855 S.W.2d 31, 35 (Tex. App.—El Paso 1993, no writ)). A party may not ratify a contract and later withdraw its ratification

---

claims were omitted from the live pleading.

[15] The supreme court also held that there is no general duty in Texas not to negligently inflict emotional distress but, because the plaintiff had proceeded in the trial court only on that theory, remanded for a new trial. *See Boyles v. Kerr*, 855 S.W.2d 593, 594 (Tex. 1993).

17

and seek to avoid the contract. *American Med. Techs., Inc. v. Miller*, 149 S.W.3d 265, 271 (Tex. App.—Houston [14th Dist.] 2004, no pet.)*; Lely Dev. Corp.*, 86 S.W.3d at 792 (citing *Missouri Pac. Ry. Co. v. Brazil*, 10 S.W. 403, 406 (Tex. 1888)). The inquiry focuses on the actions taken by the party seeking to avoid a contract. *Thomson Oil Royalty, LLC v. Graham*, 351 S.W.3d 162, 166 (Tex. App.—Tyler 2011, no pet.); *Harris v. Archer*, 134 S.W.3d 411, 427 (Tex. App.—Amarillo 2004, pet. denied); *see F. M. Stigler*, 609 S.W.2d at 756–57. Here, Skyline and Pecos did not seek to avoid the contract. Rather, Skyline and Pecos seek to enforce the partnership agreement, and it was Woerner who attacked the validity of the agreement in the trial court.

Further, the partnership agreement contained a non-waiver clause providing that the failure to insist on strict performance of any obligation or to exercise any right under the agreement did not constitute a waiver of any breach or duty. Although non-waiver clauses may themselves be waived, they are generally considered valid and enforceable. *Breof BNK Tex., L.P. v. D.H. Hill Advisors, Inc.*, 370 S.W.3d 58, 66 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *A.G.E., Inc. v. Buford*, 105 S.W.3d 667, 676 (Tex. App.—Austin 2003, pet. denied). Woerner asserts that a non-waiver clause does not allow a partner to accept the benefits of "an action intertwined with [an alleged] breach without notifying the offending partner" and such "behavior is not just a waiver[;] it is also a ratification." Woerner cites no evidence or authority in support of this argument and has therefore waived it. *See* Tex. R. App. P. 38.1(i). In addition, the record contains no evidence that Skyline received any benefit from failing to enforce the required order of distributions. Instead, the evidence established that Texas Skyline did not receive some of the distributions owed to it and Skyline and Pecos lost the use of the funds distributed to Woerner and Reinking.

18

To the extent that Woerner argues that Texas Skyline waived the non-waiver agreement, we do not find that argument persuasive. Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *In re Universal Underwriters of Tex. Ins. Co.*, 345 S.W.3d 404, 407 (Tex. 2011) (orig. proceeding). In determining waiver, we must examine the words and conduct of the parties, and it must be "unequivocally manifested" that it is the intent of the party to no longer assert the right in question. *RM Crowe Prop. Servs. Co., v. Strategic Energy, L.L.C.*, 348 S.W.3d 444, 449 (Tex. App.—Dallas 2011, no pet.); *Rodriguez v. Villarreal*, 314 S.W.3d 636, 645 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

Woerner does not contend that Texas Skyline expressly waived the non-waiver clause but cites Texas Skyline's acceptance of distributions after it knew of the distributions to Woerner and Reinking. The evidence showed that Texas Skyline learned of the distributions to Woerner and Reinking when it received its first distribution and the Budget Final in October 2007, around the same time it learned of the loan. Within ten days, it took steps to assert its rights under the agreement by reserving its right to replace DPRS as general partner and later doing so, pointing out that the loan and distributions violated the partnership agreement, attempting to remove records from Woerner's control, and ultimately filing suit.[16] Thus Texas Skyline did not "unequivocally manifest" an intent to no longer assert its rights under the non-waiver clause. *See Strategic Energy*, 348 S.W.3d at 449; *Rodriguez*, 314 S.W.3d at 645; *Guzman v. Ugly Duckling Car Sales of Tex., L.L.P.*, 63 S.W.3d 522, 528 (Tex. App.—San Antonio 2001, pet. denied) (prior acceptance of late

---

[16] Ferstler testified that initially Texas Skyline wanted to avoid litigation over the loan and that only in discovery after suit was filed did Texas Skyline learn the full extent of the funds Woerner had transferred to his personal accounts.

payments without pursuing remedies under contract did not waive non-waiver clause where payee corresponded with payor and warned of delinquent status and possible consequences). We overrule Woerner's issue 1-C.[17]

Having upheld the trial court's judgment on Texas Skyline's breach of contract claim, which supports the trial court's award of actual damages, we need not reach Woerner's second issue, in which he challenges the trial court's judgment as to breach of fiduciary duties.[18] *See* Tex. R. App. P. 47.1. We turn, then, to Woerner's final issue.

**Attorney's Fees**

In his third issue, Woerner argues that there is no basis in law for the trial court's award of attorney's fees to Pecos and Texas Skyline. The trial court entered conclusions of law that Pecos was entitled to attorney's fees as the prevailing party in a breach of contract claim under section 38.001 of the Civil Practices and Remedies Code and that Texas Skyline was entitled to attorney's fees as a derivative claimant under sections 153.401 and 153.405 of the Business Organizations Code. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8) (providing for recovery of attorney's fees in suit on oral or written contract); Tex. Bus. Orgs. Code §§ 153.401, .405. Section

---

[17] In a single sentence in each of sub-issues 1-A, 1-B, and 1-C, Woerner argues in the alternative that even if the payments breached the partnership agreement, only DPRS can be liable because there are no pleadings or findings to support piercing its corporate veil. Woerner has not presented any argument or cited to any evidence in the record or to any authority in support of this assertion and has therefore waived it. *See* Tex. R. App. P. 38.1(i). Further, Texas Skyline asserted claims against Woerner individually as a partner in Pecos, for which his liability is not predicated on piercing the corporate veil of DPRS.

[18] Although Skyline and Pecos sought exemplary damages, the trial court did not award any such damages.

153.401 of the Business Organizations Code provides that a limited partner may bring an action on behalf of the limited partnership if "(1) all general partners with authority to bring the action have refused to bring the action; or (2) an effort to cause those general partners to bring the action is not likely to succeed." Tex. Bus. Orgs. Code § 153.401(1), (2). Section 153.405 provides for the recovery of attorney's fees in a successful derivative action. *Id.* § 153.405.

Woerner contends that Pecos was not entitled to recover attorney's fees because it did not pay the attorney's fees, which were paid by Texas Skyline. Woerner further contends that after Texas Skyline appointed Skyline Interests as general partner, Skyline Interests caused the partnership to sue Woerner, and because the general partner did bring an action, Texas Skyline had no right to bring a derivative action under section 153.401.[19] The trial court issued findings of fact that Texas Skyline retained attorneys on behalf of Pecos, that Pecos was required to—and agreed to—reimburse Texas Skyline for all fees and expenses incurred on behalf of Pecos under the terms of the partnership agreement, and that Pecos and Texas Skyline incurred reasonable and necessary attorney's fees. The record contains evidence to support these unchallenged findings. The attorney for Skyline and Pecos averred by affidavit that he had been retained by Texas Skyline on behalf of Pecos and that all the parties had agreed that Pecos would reimburse Texas Skyline for the fees. Section 5.5(a) of the partnership agreement required Pecos to indemnify anyone who incurred any

---

[19] In the alternative, Woerner argues that if this Court holds that Woerner breached the agreement, attorney's fees can be awarded only against DPRS and not against Woerner individually. As we have already discussed, there is no merit to Woerner's argument that only DPRS can be liable on the ground that there are no pleadings or findings to support piercing its corporate veil.

liability or expense by acting as a representative of the partnership. Therefore, these unchallenged findings are binding. *See McGalliard*, 722 S.W.2d at 696; *McAleer*, 394 S.W.3d at 620.

In addition, the evidence showed that Texas Skyline executed a unanimous written consent removing DPRS as general partner and naming Skyline Interests in its stead but that Woerner refused to recognize the action or to turn over the books. DPRS, as general partner, did not institute the suit and as potential defendant was not likely to do so if asked. *See* Tex. Bus. Orgs. Code § 153.401(2). Texas Skyline then instituted this proceeding as a limited partner in Pecos, and Texas Skyline paid the attorney's fees on behalf of Pecos after the trial court issued a temporary injunction prohibiting the parties from using partnership funds during the pendency of the trial. There was also evidence that after the transfers made by Woerner, Pecos did not have sufficient funds to pay the fees. These unchallenged findings and this evidence support the trial court's conclusions of law regarding attorney's fees, and we cannot conclude on this record that they were erroneous as a matter of law. *See Condom Sense*, 390 S.W.3d at 749; *Thomas*, 71 S.W.3d at 485. We overrule Woerner's third issue.

## CONCLUSION

Having overruled Woerner's issues, we affirm the judgment of the trial court.

_____

Melissa Goodwin, Justice

Before Justices Puryear, Henson, and Goodwin
    Justice Henson not participating

Affirmed

Filed:   August 13, 2014

23