**Opinion of October 29, 2019, Withdrawn, Motion for Rehearing Denied, Affirmed, and Substitute Opinion filed February 13, 2020.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-17-00899-CV

---

## ROBERT KLINEK, Appellant

## V.

## LUXEYARD, INC., Appellee

---

### On Appeal from the 113th District Court
### Harris County, Texas
### Trial Court Cause No. 2012-54501

---

## S U B S T I T U T E   O P I N I O N

We deny appellant Robert Klinek's motion for rehearing; however, because he raised a jurisdictional issue in his motion, we withdraw our opinion of October 29, 2019, and substitute this opinion to address the trial court's jurisdiction.[1]

---

[1] A complaint that the trial court lacked jurisdiction may be raised for the first time in a motion for rehearing. *See, e.g.*, *Jefferson County v. Davis*, No. 14-13-00663-CV, 2014 WL 5492803 (Tex. App.—Houston [14th Dist.] Oct. 30, 2014, no pet.) (supp. mem. op. on denial of

In this appeal from the judgment rendered after a non-jury trial, appellant Robert Klinek challenges the judgment ordering him to disgorge to appellee LuxeYard, Inc. the profits he obtained by conspiring in shareholder Kevan Casey's breach of fiduciary duty. Klinek also contends the trial court miscalculated the amount of those profits, as well as the damages awarded to him in his successful counterclaim for breach of contract.

Regarding Klinek's appeal of the disgorgement judgment against him, we conclude that

(a)     LuxeYard sufficiently alleged that Klinek conspired in a breach of fiduciary duty,

(b)     the claim is not barred by LuxeYard's failure to sue Casey in this lawsuit,

(c)     LuxeYard's answer to a contention interrogatory did not restrict the tort underlying its conspiracy claim to common-law fraud,

(d)     there is legally sufficient evidence that Casey breached his fiduciary duties to LuxeYard,

(e)     there is legally sufficient evidence that Klinek conspired in Casey's breach, and

(f)     the trial court correctly calculated the profits Klinek was ordered to disgorge.

As for Klinek's counterclaim, we find no error in the trial court's calculation of Klinek's damages. Regarding his motion for rehearing, we conclude that the trial court properly exercised jurisdiction over LuxeYard's claims against Klinek. Thus, we affirm the judgment.

---

reh'g); *In re Small*, 286 S.W.3d 525, 529 (Tex. App.—Houston [14th Dist.] 2009, orig. proceeding).

# I. BACKGROUND

In the summer of 2010, Khaled Alattar rented office space from Amir Mireskandari, who was in the business of liquidating retail merchandise. Alattar and Mireskandari became friends, and Alattar suggested that that it would be profitable to liquidate luxury merchandise through online "flash sales" to subscribers to a website. The following spring, Alattar and Mireskandari began the business by forming LY Retail LLC ("LY"), through which they planned to do business as "LuxeYard.com." Alattar focused on the technology while Mireskandari handled the business plan and financials.

For help with the latter, Mireskandari contacted his friend and financial advisor Frederick "Rick" Huttner, who introduced him to Kevan Casey. Huttner and Casey suggested taking the company public so it could be capitalized through the sale of shares. As part of that plan, LY entered into a "Term Sheet" with Casey's company, Far East Strategies, LLC. The Term Sheet contemplated LY's reverse merger with a publicly traded shell company to be provided by Far East Strategies. The parties agreed that only the Term Sheet's "No Shop" and "Governing Law" provisions were binding. Under the no-shop provision, LY agreed that for ninety days it would not solicit or encourage any other proposals relating to the sale or issuance of any stock in LY or of its stock or assets. The "Governing Law" provision states that Texas law applies.

Casey introduced Jonathan Friedlander and Lawrence Isen to LY as people who would help with marketing the company's shares. Although Casey admitted that he may then have known that Isen had a judgment against him for securities fraud, Casey did not disclose this to the company.

Casey also recommended the law firm of Anslow & Jaclin (A&J) to LY and negotiated the terms of its representation.

3

## A.     The Merger with Top Gear, Inc. and the First Subscription Agreement

The public company that Casey selected for the merger was Top Gear, Inc. As part of the merger, Top Gear offered investors a Subscription Agreement, under which investors bought restricted shares together with restricted warrants to purchase an equal number of shares. A&J prepared the Subscription Agreements, and Casey reviewed and revised them.

The restricted shares under the Subscription Agreement bore a legend preventing their sale or transfer for the period of time prescribed by Rule 144 of the Securities Act of 1933. *See* 17 C.F.R. § 230.144. The same restrictions applied to the exercise of the warrants. Under Rule 144, if the company issuing the shares has never been a shell company, then the restricted shares can be sold six months after the shareholder acquired them, but if the issuing company previously was a shell company, then the restricted shares cannot be sold for one year after the company files "Form 10 information" with the SEC. *See id.* In one of Top Gear's SEC filings, it identified itself as a shell company, but in all of its other SEC filings, Top Gear represented that it was not a shell company.

The merger closed in November 2011, after which LY was Top Gear's wholly owned subsidiary. In early 2012, Top Gear changed its name to LuxeYard. Together, Alattar and Mireskandari owned more than 50% of LuxeYard's voting shares.

## B.     Klinek's Connection with Top Gear/LuxeYard

LuxeYard still needed capital after the merger, and in December 2011, Casey reached out to additional contacts, who were to offer the investment opportunity to their friends and family. One of these contacts was David Bahr, who purchased free-trading shares but did not buy restricted shares and warrants pursuant to the Subscriber Agreement. Bahr offered Robert Klinek the same deal that investors were

offered in November, that is, to purchase restricted shares and warrants pursuant to a Subscriber Agreement, coupled with the purchase of free-trading shares from Top Gear's pre-existing shareholders pursuant to a separate Stock Purchase Agreement to which LuxeYard was not a party. Klinek agreed.

## C.  LuxeYard's Share Price Rise and Fall

LuxeYard alleges that Casey, Klinek, and others participated in a "pump-and-dump" scheme in which the price of LuxeYard's shares was artificially increased through aggressive marketing and matched sales of free-trading shares before the co-conspirators liquidated their holdings, driving the share price down to near worthlessness.

Casey had given Friedlander, through Friedlander's company Equity Highrise, a large block of shares to sell to finance a "marketing blitz." One sale was to Klinek. Phone records showed that although Friedlander and Klinek did not communicate directly, they called Bahr on the days preceding, and the day of, Klinek's purchase. LuxeYard argued that this was an illegal "matched order."

By selling shares given to him by Casey, Friedlander was able to engage a company called NextMedia and pay it $2.8 million to market LuxeYard. Friedlander admits that he did so without LuxeYard's authority or approval; that he "did have controls over [NextMedia's] marketing campaign"; and that he knew when the campaign would run. Some of the information in the campaign was misleading, including statements that LuxeYard was expected to reach a million members in less time than Facebook did. Isen disseminated the same misleading information in his blog, *OTC Journal*.

The marketing campaign ran in April 2012, and Casey's alleged co-conspirators sold the overwhelming majority of their shares during that time. Klinek

had bought about 250,000 shares through the Share Purchase Agreement for about $147 and bought 100,000 shares from Friedlander in March for about $52,000; Klinek sold 325,000 of his 350,000 shares while the marketing blitz was running in April, and he sold the rest on two days in early May. The difference between the free-trading shares' total sales price and total purchase price was nearly $400,000.

## D.    Klinek's Attempts to Remove Restrictions from the Subscription Shares and Warrants

Before the marketing campaign's effects dissipated, Klinek attempted to have the restrictions removed from the shares and warrants he purchased through the Subscription Agreement. On May 8, 2012, he sent LuxeYard notice that he was performing a cashless exercise of his warrants and instructed LuxeYard to have unrestricted shares sent to him. LuxeYard responded that the restrictions were not yet eligible to be lifted under Rule 144.

On November 14, 2012, Klinek again tried to have the restrictive legend removed from his shares, this time supporting his request with an opinion letter from his attorney that the company's prior status as a shell company was "cured" as of November 15, 2012. Klinek no longer sought to exercise the warrants because the share price had dropped below the cost of exercising them. Based on its belief in Klinek's wrongdoing, LuxeYard refused to issue unrestricted shares until January 24, 2013.

## E.    The Federal and State Lawsuits

The pump-and-dump scheme resulted in federal and state lawsuits involving dozens of parties and shifting alignments. In the federal suit, LuxeYard sued Casey for breach of fiduciary duty, but a few days after this suit was filed in state court, LuxeYard and Casey settled those claims.

In this lawsuit, LuxeYard sued Klinek for common-law fraud, unjust enrichment, and for conspiring in a breach of fiduciary duty,[2] it but asserted no claims for breach of fiduciary duty against any defendant in state court. Klinek counterclaimed for LuxeYard's failure to promptly lift the restrictions from his Subscription shares and warrants after the restrictive period ended.

After a lengthy bench trial, the trial court ordered Klinek to pay LuxeYard $395,146.63 as equitable disgorgement of Klinek's profits from the sale of free-trading shares; the trial court did not expressly identify the cause of action on which the judgment for LuxeYard was based. On Klinek's counterclaim, the trial court awarded Klinek $36,503.30 in breach-of-contract damages calculated as the decline in share price from November 15, 2012 (the date a twelve-month restriction should have been lifted), to January 24, 2013 (the date the restrictions actually were lifted), together with statutorily required attorney's fees.

On appeal, Klinek seeks rendition of a take-nothing judgment on LuxeYard's claims. As for his counterclaim, Klinek seeks rendition of judgment for actual damages of $1,316,059.68, or alternatively, remand solely for recalculation of damages measured by the change in share price from June 11, 2012, to January 24, 2013.

## II. ISSUES PRESENTED

Klinek presents five compound issues on appeal. In his first three issues, he challenges the judgment in LuxeYard's favor for disgorgement of Klinek's profits from the sale of his free-trading shares. Klinek argues in his fourth issue that the trial court miscalculated the damages on his successful counterclaim for breach of

---

[2] LuxeYard also pleaded that Klinek aided and abetted a breach of fiduciary duty, but Klinek contends that LuxeYard expressly abandoned this allegation before trial. LuxeYard does not deny this representation, which is supported by the record.

7

contract. In his fifth issue, he contends that certain of the trial court's findings related to his counterclaim are immaterial or are based on legally or factually insufficient evidence.

### III. APPEAL OF THE JUDGMENT ON LUXEYARD'S TORT CLAIMS

In his first and third issues, Klinek contends that if the trial court's judgment against him is based on conspiring in a breach of fiduciary duty, then the judgment must be reversed or modified because (a) LuxeYard did not plead breach of fiduciary duty as the tort underlying its conspiracy claim, (b) a defendant cannot be held liable for conspiring in an intentional tort that was not asserted against a named co-defendant, (c) LuxeYard swore in a discovery response that the tort underlying its conspiracy claim was fraud rather than breach of fiduciary duty, (d) there is no evidence that Casey owed and breached a fiduciary duty to LuxeYard, (e) there is no evidence that Klinek knowingly participated in a breach of fiduciary duty, and (f) the trial court miscalculated Klinek's profits. We address each of these arguments in turn.

### A. LuxeYard's Pleadings are Sufficient.

Under the subheading, "Conspiracy Asserted by LuxeYard," LuxeYard pleaded that certain defendants—including Klinek and Bahr—"had a meeting of the minds to accomplish a common object, namely, to use LuxeYard as a front to perpetrate a pump and dump scheme and thereby to illegally profit at the expense of LuxeYard, its shareholders, and others. . . . Moreover, Defendants knowingly participated in a breach of fiduciary duty."

At oral argument, Klinek's counsel characterized this statement as a "stray reference" left after LuxeYard amended its pleading to drop allegations that Casey breached a fiduciary duty to LuxeYard. But pleadings need only "provide fair notice

8

of the claim and the relief sought such that the opposing party can prepare a defense." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (orig. proceeding) (citing TEX. R. CIV. P. 45 & 47).[3] A pleading is sufficient "if a court can 'ascertain with reasonable certainty the elements of a cause of action and the relief sought with sufficient particularity upon which a judgment may be based.'" *Orr v. Broussard*, 565 S.W.3d 415, 420 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (quoting *Wortham v. Dow Chem. Co.*, 179 S.W.3d 189, 198 (Tex. App.—Houston [14th Dist.] 2005, no pet.)).

Conspiracy requires proof of knowing participation;[4] thus, by including in its conspiracy allegations the statement that Klinek "knowingly participated in a breach of fiduciary duty," LuxeYard sufficiently pleaded that Klinek conspired in the breach.

Although Klinek implies that the pleading is inadequate because LuxeYard's conspiracy allegation does not name the fiduciary in whose breach Klinek conspired, we reject that contention as well. Klinek did not specially except to LuxeYard's live pleading, and under the subheading, "Exemplary Damages Asserted by Alattar" is the allegation, "Casey was a fiduciary to LY, to Alattar and to LuxeYard . . . ." Moreover, when Klinek stated in his pretrial brief that LuxeYard had not alleged a tort underlying its conspiracy claim, LuxeYard responded,

---

[3] As discussed in section III.D.1., *infra*, Delaware law determines whether Casey owed LuxeYard fiduciary duties. Pleading requirements, however, are a procedural matter. *See Tex. Dep't of Corrections v. Herring*, 513 S.W.2d 6, 8 (Tex. 1974). The law of the forum state governs matters of procedure, even when another state's substantive law applies. *Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 872 (Tex. 2017).

[4] *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 225 (Tex. 2017). LuxeYard at times seems to treat "knowing participation" as a separate theory, but as LuxeYard pleaded it, "knowing participation" is part of its conspiracy allegation and did not give Klinek fair notice of a different theory of collusion. *Cf. id.* at 224–25 (because plaintiff asserted claims of conspiracy and joint venture, both of which require proof of knowing participation, the allegation that a defendant knowingly participated in another's breach of fiduciary duty was insufficient to raise a distinct theory of liability).

Luxeyard will prove (1) that Klinek and other Defendants have committed fraud against Luxeyard in connection [with] the Subscription Agreements they executed; and (2) that the law firm of Anslow & Jaclin and Casey committed breaches of fiduciary duty to Luxeyard. These are the multiple underlying torts on which Luxeyard's conspiracy claim is predicated.

Klinek's counsel acknowledged LuxeYard's allegations that Klinek and Casey were co-conspirators, stating in opening argument, "LuxeYard now contends in this litigation that my clients, Klinek and Pack, husband and wife, were part of a pump-and-dump conspiracy orchestrated by Mr. Kevan Casey that put LuxeYard out of business."

## B.     LuxeYard Did Not Have to Sue the Fiduciary in This Lawsuit.

Civil conspiracy is not a stand-alone tort. *See Moore v. Bushman*, 559 S.W.3d 645, 654 Tex. App.—Houston [14th Dist.] 2018, no pet.). Klinek seeks reversal on the ground that "a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (orig. proceeding) (op. on reh'g) (citing *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1979)).[5] But LuxeYard *did* seek to hold a named defendant liable for the underlying tort; the difference is that the alleged tortfeasor was named as a defendant in a different suit.

We are not persuaded that the underlying tortfeasor must be sued in the same suit with the conspirators. If this were so, then a plaintiff who learned of the conspiracy or of additional conspirators after successfully suing the tortfeasor could not prevail against the tortfeasor's confederates. The claims would be defeated not

_____

[5] Both parties have briefed only Texas law on this subject. We assume, as the parties appear to have done, that whether the underlying tortfeasor must be named as an alleged conspirator's co-defendant is a procedural matter to which Texas law applies.

10

because the plaintiff was unable to prove the underlying tort, but because the plaintiff *already* had proved it. Such a result seems inconsistent with the Texas Supreme Court's recent statement that "a civil conspiracy claim is connected to the underlying tort and survives or fails alongside it." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019) (citing *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 148 (Tex. 1999)).

Nor do we think the result is changed if the plaintiff settled the claims against the tortfeasor. The legislature has declared that "[i]t is the policy of this state to encourage the peaceable resolution of disputes . . . and the early settlement of pending litigation through voluntary settlement procedures." TEX. CIV. PRAC. & REM. CODE ANN. § 154.002. Texas courts likewise "promote a public policy that encourages settlements." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 9 (Tex. 1991), *holding modified on other grounds by Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006). If the plaintiff and the tortfeasor have reached a compromise agreement, requiring the plaintiff to continue litigating the resolved claim in order to prove a *different* defendant's liability "would contravene the policy of the courts to encourage settlements and to minimize litigation." *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794, 799 (Tex. 1992) (quoting *K&S Oil Well Serv., Inc. v. Cabot Corp.*, 491 S.W.2d 733, 739 (Tex. App.—Corpus Christi–Edinburg 1973, writ ref'd n.r.e.)).

Further, "[c]ivil conspiracy depends entirely on the injury caused by the underlying tort," *Agar Corp.*, 580 S.W.3d at 141, and a party may prosecute consecutive suits against different defendants for a single indivisible injury. This is true regardless of whether the various defendants are joint tortfeasors. *Compare Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984) ("Since Morgan allegedly suffered indivisible injury as a result of the tortious acts of two

11

wrongdoers, she had the option of proceeding to judgment against any one defendant separately or against all in one suit." (citing *Landers v. E. Tex. Salt Water Disposal Co.*, 151 Tex. 251, 248 S.W.2d 731 (1952))), *with Krobar Drilling, L.L.C. v. Ormiston*, 426 S.W.3d 107, 111–12 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (plaintiff's unsatisfied breach-of-contract judgment against defendant in first suit did not foreclose subsequent tort suit against other defendants for the same indivisible injury). The plaintiff may even bring the second suit after the first case settles. *See First Title Co. of Waco v. Garrett*, 860 S.W.2d 74, 76, 79 (Tex. 1993).

As in *Morgan*, *Krobar Drilling*, and *Garrett*, the trial court based its judgment in LuxeYard's favor on a single indivisible injury. Here, that injury was harm to the trust relationship with Casey. We know that the disgorgement judgment was based on this injury inasmuch as (1) the trial court awarded no damages, and (2) equitable remedies such as fee forfeiture and disgorgement are available despite the absence of actual damages because their purpose is "to protect relationships of trust by discouraging agents' disloyalty." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 221 (Tex. 2017) (quoting *Burrow v. Arce*, 997 S.W.2d 229, 238 (Tex. 1999)) (both cases discussing the equitable remedy of fee forfeiture).

There also is authority for holding a conspirator liable even when the conspirator is the only defendant. In *Paschal v. Great Western Drilling, Ltd.*, 215 S.W.3d 437 (Tex. App.—Eastland 2006, pet. denied), an employer successfully sued an employee's widow for claims that included conspiring in the employee's theft from his employer in breach of the employee's fiduciary duty. *See id.* at 442–43. The jury found in favor of the employer, and on appeal, the widow argued that the trial court erred by asking the jury to assess damages for her late husband's breach of fiduciary duty because the damages were based on the conduct of a non-party. *Id.* at 451. The *Paschal* court disagreed, stating that the damage question was predicated

12

on a finding that the widow was part of a conspiracy that damaged the employer, and "[o]nce a conspiracy is proven, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy." *Id.* (citing *Carroll*, 592 S.W.2d at 926).

On the particular facts presented in this case, we conclude that LuxeYard's claim against Klinek for conspiring in Casey's breach of fiduciary duty is not foreclosed by LuxeYard's settlement of such claims against Casey in a separate suit. Thus, we overrule Klinek's first issue.

## C.     LuxeYard's Discovery Response Did Not Limit Its Conspiracy Claim.

Klinek additionally contends that LuxeYard cannot recover from Klinek for conspiring in a breach of fiduciary duty because LuxeYard is bound by its answer to the contention interrogatory, "If you contend Klinek's purchase of 100,000 shares in March 2012 aided a tort being committed by other conspirators, please explain what tort." LuxeYard responded that Klinek's purchase was "an illegal matched order" that "aided Klinek's co-conspirators in committing common-law fraud against Luxeyard." But, as LuxeYard points out, it additionally stated in its answer, "Luxeyard incorporates by reference and refers Klinek . . . to the Plaintiffs['] Second Amended Omnibus Petition and Klinek's deposition testimony."

LuxeYard is correct, but this is not the only reason we reject Klinek's argument. Although Klinek interprets his interrogatory as asking LuxeYard to identify all torts on which its conspiracy claim is based, the interrogatory asked LuxeYard to identify the tort underlying the conspiracy claim only as it concerns a single transaction. It does not address Klinek's initial acceptance of the December 2011 offer to purchase free-trading shares, the consummation of that purchase in January 2012, or Klinek's sale of any of his free-trading shares—all of which could be treated as transactions in furtherance of the conspiracy for the breach of Casey's

13

alleged fiduciary duties to LuxeYard. Thus, we conclude that LuxeYard's conspiracy claim was not limited to common-law fraud.

**D.     There is Legally Sufficient Evidence that Casey Breached His Fiduciary Duties.**[6]

When reviewing the trial court's findings of fact and conclusions of law after a bench trial, we are not bound by the trial court's designation of a statement as a factual finding or a legal conclusion but will instead apply the standard of review appropriate to each. *Tex. Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 n.7 (Tex. 2019). We review a trial court's factual findings under the same well-established appellate standards that apply to a jury's verdict. *Id.* at 653.[7] If the trial court made a factual finding of least one element of a ground of recovery or defense, then omitted, unrequested elements, if supported by the evidence, are supplied by presumption in support of the judgment. TEX. R. CIV. P. 299. We review conclusions of law de novo. *Bos v. Smith*, 556 S.W.3d 296, 299 (Tex. 2018).

Before addressing the sufficiency of the evidence that Casey owed and breached a fiduciary duty, we first must resolve a dispute about which state's law applies to the question.

### 1.     *Delaware Law Governs the Existence of a Fiduciary Duty.*

The parties agree that that LuxeYard is a Delaware corporation, and that under Texas law, a corporation's "internal affairs" are governed by the law of the state where it was incorporated. *See* TEX. BUS. ORGS. CODE ANN. § 1.102. The parties disagree about whether the existence of a fiduciary duty is among a corporation's

---

[6] Although Klinek stated that he also challenges the factual sufficiency of the evidence of breach, he did not brief that issue.

[7] *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

"internal affairs." LuxeYard additionally argues that Texas law applies because the Term Sheet between LY Retail d/b/a Luxeyard.com and Far East Strategies contains a Texas choice-of-law provision, as does the Subscription Agreement between Top Gear and Klinek (although LuxeYard may have meant the Subscription Agreement between Top Gear and Casey).

Because a corporation's "internal affairs" include "the rights, powers, and duties of its governing authority, governing persons, officers, [and] owners" as well as "matters relating to its . . . ownership interests,"[8] we agree with Klinek that Delaware law governs the question of whether Casey owed LuxeYard fiduciary duties. LuxeYard contends that Casey owed it fiduciary duties as a *de facto* officer or director, and because this is an argument that Casey owed LuxeYard fiduciary duties as a "governing person" or "officer" as those terms are used in the statute, Casey's status as a *de facto* officer or director is among the corporation's "internal affairs" that is governed by Delaware law. LuxeYard also suggests that Casey owed it fiduciary duties based on the extent of Casey's ownership interests, and under the statute's terms, this, too, is an "internal affair" to which Delaware law applies.

This conclusion is unaffected by the Term Sheet's and Subscription Agreement's Texas choice-of-law provisions. LY and Far East Strategies agreed that the Term Sheet "imposes no duty or obligation on any of the parties" other than to abide by the no-shop and governing-law provisions. Because nothing else in the Term Sheet is binding, there is nothing left for Texas law to govern other than the no-shop provision, which is not at issue. The Subscription Agreement's choice-of-law provision is similarly inapplicable, for it states only, "This Agreement shall be governed by and construed in accordance with the Laws of the State of Texas,

---

[8] TEX. BUS. ORGS. CODE ANN. § 1.105.

15

without regard to conflicts of Laws principles." The Subscription Agreement neither acknowledges nor purports to create a fiduciary relationship.

Thus, in analyzing the sufficiency of the evidence that Casey breached his fiduciary duties, we consider the elements of that tort as defined by Delaware's substantive law, while continuing to apply Texas law to the procedural issues. *See Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 872 (Tex. 2017).[9]

### 2. There Is Legally Sufficient Evidence of Casey's Breach of Fiduciary Duty Under Delaware Law.

Under Delaware's substantive law, the "elements of breach of fiduciary duty that must be proven by a preponderance of evidence by the plaintiff are: (i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty." *Legatski v. Bethany Forest Assoc., Inc.*, C.A. No. 03C-10-011-RFS, 2006 WL 1229689, at *3 (Del. Super. Ct. Apr. 28, 2006) (quoting *York Lingings v. Roach*, No. 16622-NC, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999)). The existence of duty ordinarily is a question of law. *See Fed. Ins. Co. v. Hilco Capital, LP*, C.A. No. 06-02-248 (JRJ), 2008 WL 3021109, at *4 (Del. Super. Ct. Aug. 5, 2008), *aff'd*, 978 A.2d 174

---

[9] In his motion for rehearing, Klinek asserts for the first time that actual damages are an essential element of conspiracy under Delaware law; however, he has never argued that Delaware law applies to the conspiracy claim. We apply Delaware law to questions of LuxeYard's "internal affairs," such as whether Casey owed LuxeYard a fiduciary duty, because a Texas statute requires us to do so. But conspiracy is not an internal affair. Klinek has never argued that Delaware law applies to the conspiracy claim under a conflict-of-laws analysis, and under Texas law, the party asserting that another state's law applies bears the burden (a) to show that the law of Texas conflicts with the other state's law, and (b) to demonstrate which law should apply based on state contacts to the asserted claims. *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 650 (Tex. App.—Houston [14th Dist.] 1995), *subsequent mandamus proceeding sub nom. Deloitte & Touche, LLP v. Fourteenth Court of Appeals*, 951 S.W.2d 394 (Tex. 1997), *and abrogated on other grounds by Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Because Klinek has not shown that Delaware law applies to the conspiracy claim, we apply Texas law. *See, e.g.*, *Petras v. Mole*, No. 3:11-CV-1402-N, 2013 WL 12362098, at *5 (N.D. Tex. Jan. 31, 2013) (applying the law of the company's state of incorporation to breach-of-fiduciary-duty claim and Texas law to conspiracy claim).

16

(Del. 2009). Whether a fiduciary duty has been breached is a question of fact. *See, e.g.*, *In re Cornerstone Therapeutics Inc., Stockholder Litig.*, 115 A.3d 1173, 1186–87 & n.54 (Del. 2015); *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 237 (Del. 2009); *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1059 (Del. Super. Ct. 2001). The trial court concluded that Casey owed a fiduciary duty to LuxeYard and found that "Klinek assisted Casey and others in the commission of a breach of fiduciary duty against LuxeYard."[10]

### (a) There Is Legally Sufficient Evidence of Duty.

Klinek argues that in determining whether he owed LuxeYard fiduciary duties, the trial court relied on an erroneous view of the law. The trial court made the legal conclusion that "Casey was an insider as to LuxeYard because he owned or controlled substantially more than 10% of its shares at material times." As Klinek correctly points out, a minority shareholder does not become a fiduciary under Delaware law merely because the shareholder owns more than 10% of the company's outstanding shares. A shareholder owes fiduciary duties to the other shareholders and to the corporation in only two circumstances: (1) the shareholder owns, directly or indirectly, a majority of the corporation's voting power; or (2) the shareholder, though owning less than half of the corporation's voting shares, actually controls the corporation's conduct. *See Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005); *Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990).

Under Texas procedural law, however, we will not reverse a judgment based on an incorrect conclusion of law if the trial court's controlling findings of fact

---

[10] The latter was mislabeled as a conclusion of law.

17

support the judgment under a correct legal theory. *BACM 2001-1 San Felipe Road Ltd. P'ship v. Trafalgar Holdings I, Ltd.*, 218 S.W.3d 137, 143 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). The trial court found that Klinek assisted Casey's breach of his fiduciary duty to LuxeYard, so any other factual findings needed to support the judgment on that basis are presumed found if supported by the record. *See* TEX. R. CIV. P. 299. And there is ample evidence that Casey dominated LuxeYard's board of directors so as to control the corporation's conduct.

From the evidence and the inferences reasonably drawn from it, the trial court reasonably could find that Casey

- lent money to LuxeYard;

- negotiated the terms on which LuxeYard would hire A&J;

- selected the shell for the reverse merger;

- negotiated the price for the shell;

- reviewed key documents prepared by LuxeYard;

- reviewed LuxeYard's budgets;

- reviewed the transaction documents before the reverse merger;

- instructed A&J to conceal from LuxeYard its conflict of interest in representing all sides of the merger;

- dictated whose shares would be subject to a lock-up agreement;

- revised Alattar's lock-up agreement with LuxeYard;

- reviewed and revised LuxeYard's Subscription Agreements;

- decided on the purchasers of LuxeYard's free-trading shares;

18

- reviewed the Stock Purchase Agreements, all of which A&J sent to him;

- instructed A&J to post-date the Stock Purchase Agreements to conceal that, contrary to the representations made to LuxeYard in the Subscription Agreements, the subscribers were simultaneously accepting offers to purchase both restricted and free-trading shares;

- instructed Klinek, through Bahr, to fraudulently misrepresent that Klinek was not simultaneously purchasing restricted and free-trading shares;

- fraudulently induced LuxeYard to enter into the Subscription Agreements by making and concealing these misrepresentations;

- told LuxeYard to order certain reports;

- introduced Klinek's co-defendant Tommy Allen to LuxeYard and reviewed LuxeYard's consulting agreement with him;

- represented to LuxeYard that Isen would promote the company while failing to disclose that Isen had a judgment against him for securities fraud;

- gave Isen 50,000 free-trading shares to promote the stock and gave him misleading information about LuxeYard to include in Isen's promotions;

- gave Friedlander 2.5 million shares of free-trading stock in LuxeYard with instructions to sell them to fund the misleading advertising in support of the pump-and-dump scheme;

- instructed A&J to advise LuxeYard not to take action to correct or stop the dissemination of misleading information about LuxeYard that Isen and Friedlander had caused to be advertised to potential investors; and

- served as the investor representative through his wholly owned company Jinsun LLC.

As Mireskandari testified,

19

All the financing issues were discussed and run -- all my pro formas -- every single pro forma LuxeYard did ran by Mr. Casey and Mr. Huttner. They had input on it. They would make recommendations. First it was recommendations. Then it was -- it was cramdowns. It was, like, "Well, you know what? You need to change your marketing budget from X to Y." And, actually, there's e-mails saying, "You need to do this. You need to do that."

In sum, there is legally sufficient evidence that Casey dominated LuxeYard's board and controlled the corporation's actions both openly (through his influence as the corporation's creditor, as its investor representative, and as the person responsible for LuxeYard's capitalization through the sale of restricted shares and warrants under the Subscription Agreements) and secretly (by controlling the information and advice LuxeYard's board members received from the law firm on which they relied).

Klinek also asserts that if Casey owed any fiduciary duties, he owed them to other shareholders rather than to LuxeYard. But Klinek is mistaken. Directors owe fiduciary obligations to both the corporation and its shareholders,[11] and those obligations include the fiduciary duties of care, good faith, and loyalty. *See Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001). Because a controlling shareholder exercises actual control of the board of directors,[12] the controlling shareholder has the same fiduciary duties as a director. *See, e.g.*, *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). And as with directors, a controlling shareholder's fiduciary duties are owed to the corporation as well as to its shareholders. *See, e.g.*, *Ams. Min. Corp. v. Theriault*, 51 A.3d 1213, 1218–19 (Del. 2012) (affirming judgment in a shareholders' derivative suit that the controlling corporate

---

[11] *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007).

[12] *See In re KKR Fin. Holdings LLC Shareholder Litig.*, 101 A.3d 980, 992–93 (Del. Ch. 2014), *aff'd sub. nom. Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015).

shareholder's directors and subsidiary breached the fiduciary duty of loyalty both to the corporation and to other shareholders).

### (b) There is Legally Sufficient Evidence of Breach.

Klinek states that LuxeYard did not attempt to prove the element of breach, and that Casey merely "invested in the company, assisted in setting up the reverse merger, served as its investor representative, and was involved in various publicity campaigns to promote the company—with the knowledge and blessing of LuxeYard."

The record, however, contains ample evidence that Casey breached his fiduciary duties to the company. To cite an example connected with Klinek, the Subscription Agreements—including the one signed by Klinek—contain the following representation:

> Such Investor has not directly or indirectly, nor has any person acting on behalf of or pursuant to any understanding with such Investor, engaged in any transactions in the securities of the Company . . . since the time that such Investor was first contacted by the Company regarding the investment in the Company contemplated herein.

The evidence supports the implied finding that Klinek's endorsement of this representation is false. Klinek's receipt of the Subscription Agreement is itself a contact by the company, and as Klinek testified, he received the offers to buy restricted and free-trading shares at the same time and accepted the offers at the same time. But Casey instructed A&J to post-date the Stock Purchase Agreements without LuxeYard's knowledge, which would have made Klinek's misrepresentation appear to LuxeYard to be true. By this and other concealed transactions, Casey put free-trading shares in the hands of his confederates, who used them to execute, and to profit by, the pump-and-dump scheme.

Klinek also points out that in LuxeYard's federal suit against Casey, LuxeYard alleged breaches of Casey's fiduciary duty that occurred before the reverse merger, which was before Klinek invested in the company. But in Delaware, as in Texas, "allegations are not evidence." *Goldstone v. Tex. Int'l Co*, Nos. 6651, 6652, 6665 (CONSOLIDATED) & 7607, 1985 WL 11570, at *2 (Del. Ch. July 10, 1985); *see also CHRISTUS Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 540 (Tex. 2016) (same).

**E.     There is Legally Sufficient Evidence that Klinek Conspired in Casey's Breach of Fiduciary Duty.**

In arguing that there is no evidence to support the trial court's determination that Klinek conspired in Casey's breach of fiduciary duty, Klinek states that his only direct contact with Casey was a single email confirming that Klinek would proceed with the investment, although Bahr also forwarded to Klinek emails written by Casey. But direct communication with the primary tortfeasor is not an essential element of conspiracy, and there is evidence supporting an inference that communications with Klinek about the conspiracy were passed through Bahr. For example, on March 9, 2012, 105,000 shares of LuxeYard were traded, and the 100,000 shares Klinek bought had been sold by Friedlander's company Equity Highrise to fund the unauthorized "marketing blitz" that artificially inflated the price of LuxeYard's shares. While there is no evidence that Klinek and Friedlander spoke together directly, each of them had frequent phone conversations with Bahr preceding the trade, from which the trial court could infer that this trade was a "matched order."[13] Bahr also testified that he had over a hundred phone calls with

---

[13] Klinek notes that the trial court did not make a finding that this was a matched order, but it was not asked to do so. Texas procedural law does not require the trial court to make factual findings on matters that are merely evidentiary or "to set out in detail every reason or theory by which it arrived at its final conclusions." *Nicholas v. Envtl. Sys. (Int'l) Ltd.*, 499 S.W.3d 888, 894–95 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Casey after Casey introduced him to LuxeYard, and about a dozen emails; however, Bahr claimed that his computer hard-drive crashed in April 2012 so that there is no record of the emails. Presumably, the trial court did not find this explanation credible.

On this record, the trial court reasonably could infer that Klinek used Bahr as an intermediary when communicating with other confederates about the conspiracy. Consistent with this view of the evidence, the trial court specifically found that "Klinek's testimony to the effect that he lacked knowledge of the share price manipulation scheme, and that he traded LuxeYard shares independently[,] is not credible."

Klinek also argues there is no evidence that he knew Casey had fiduciary duties to LuxeYard, but the evidence supports such an inference. Klinek testified that "Mr. Casey forwarded information to Mr. Bahr, and Mr. Bahr forwarded it to me," and the information Klinek received from Bahr included the Subscription Agreement and the Stock Purchase Agreement. On December 1, 2011, Klinek emailed Bahr attaching the list of investors from the first Subscription Agreement and commenting, "[S]everal other San Diego investors[14] are involved as well as Kev[a]n Casey and his clients. Que pasa?" Klinek's phone records show that sixteen minutes after he sent this email, Bahr telephoned Klinek and they spoke for twenty-four minutes. The trial court could infer that Bahr explained Casey's role to Klinek. Klinek testified that he did not know Casey when he questioned Bahr about Casey's involvement and that he simply recognized Casey's name as someone Bahr had mentioned. As for how Klinek knew who Casey's "clients" were, Klinek testified that he simply assumed that investors from Texas were Casey's clients. But the trial

---

[14] Klinek and Bahr live in the San Diego area.

court reasonably could find these explanations not to be credible, and as the factfinder, the trial court is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

Because the evidence supports the trial court's express and implied findings that Klinek conspired in Casey's breach of fiduciary duty to LuxeYard, we overrule Klinek's first issue. It therefore is unnecessary to address his second issue, in which he argues that he cannot be held liable on LuxeYard's alternative theories of common-law fraud and unjust enrichment.

## F. The Trial Court Correctly Calculated Klinek's Profits.

Klinek asserts in his third issue that the trial court miscalculated the amount of his profits in the disgorgement award. According to Klinek, his profits on the free-trading shares should be calculated by deducting from the sales price not only the amount paid for the free-trading shares, but also the $100,000 he spent to purchase restricted shares and warrants. Those, however, are separate transactions. The pump-and-dump scheme rested on the purchase and sale only of free-trading shares, and Klinek's profit from those transactions consists only of the amount for which he sold those shares minus the costs of acquiring them and any transaction costs.

We overrule Klinek's third issue, and we affirm the portion of the judgment awarding LuxeYard judgment against Klinek in the amount of $395,146.63.

### IV. APPEAL OF THE JUDGMENT ON KLINEK'S CONTRACT CLAIM

Klinek's fourth and fifth issues concern his counterclaim for breach of contract, in which he alleged that LuxeYard breached the Subscription Agreement by failing to lift the restrictions from his shares and warrants until January 24, 2013. The parties no longer dispute that LuxeYard was required to lift the restrictions

earlier, but they disagree about the date the restrictions were permitted to be lifted. *See* 17 C.F.R. § 230.144.

Klinek contends that Top Gear was never a shell company, and because he purchased the restricted shares and warrants pursuant to the Subscription Agreement on December 9, 2011, he maintains that the restrictions should have been lifted six months later, on June 11, 2012.[15] Because LuxeYard did not lift the restrictions until January 24, 2013, Klinek contends that the trial court erred in failing to measure his damages by decline in the value of the shares and warrants from June 11, 2012, to January 24, 2013.

According to LuxeYard, however, Top Gear previously was a shell company, and because the company included "Form 10 information" in a "Super 8-K" disclosure it filed with the SEC on November 15, 2011, LuxeYard maintains that the subscription shares and warrants should have remained restricted until November 15, 2012. LuxeYard therefore argues that the trial court correctly measured Klinek's damages as the decline in the price of LuxeYard's shares from November 15, 2012, to January 24, 2013.

As to whether Top Gear previously was a shell company, Top Gear's SEC filings contained conflicting information on the subject. In one of Top Gear's SEC filings, it identified itself as a shell company, but in all of its other SEC filings, Top Gear represented that it was not a shell company.

Significantly, however, Norman Reynolds, Klinek's expert in securities law, testified that the passage of time was not the only precondition for lifting the restrictions so that the subscription shares and warrants could be sold. Reynolds

---

[15] The expiration of six months from the date Klinek purchased the shares was June 9, 2012, which fell on a Saturday; June 11, 2012, was the next business day.

stated that before unrestricted shares and warrants could be issued to Klinek, Klinek first had to provide the broker and the transfer agent an opinion letter from outside counsel that the restrictions could be lifted, and the opinion letter had to be accepted by the broker and transfer agent. Klinek similarly promised in the Subscription Agreement that he would not transfer any of the shares or warrants "without first providing [LuxeYard] with an opinion of counsel . . . to the effect that such transfer will be made in compliance with [applicable federal and state] securities laws."

It is undisputed that Klinek did not comply with the opinion-letter requirement until November 2012. He attempted a cashless exercise of the restricted warrants on May 8, 2012, by sending signed exercise notices to LuxeYard's president and chief executive officer, but this attempted exercise was too early even if the six-month restrictive period applied, and the exercise notices were not supported by an opinion letter. Klinek did not supply the transfer agent the required opinion letter until November 14, 2012. In that letter, Klinek's attorney opined that the company "has cured [its] prior shell status as of November 15, 2012, such that the stock would qualify to be sold under Rule 144." Thus, there is evidence even from Klinek's transactional attorney and his securities-law expert that the earliest date the restrictions could be lifted was November 15, 2012.

We conclude that the evidence above is legally and factually sufficient to support the trial court's finding that LuxeYard was required to issue Klinek shares free of restriction on November 15, 2012. Thus, we overrule Klinek's fourth issue. In light of our disposition of this issue, it is unnecessary to address Klinek's fifth issue, in which he challenges other factual findings related to his counterclaim, but which have no effect on the disposition of this appeal.

26

## V. FEDERAL COURTS DO NOT HAVE EXCLUSIVE JURISDICTION OVER THE CONSPIRACY CLAIM

In his motion for rehearing, Klinek argues for the first time that federal courts have exclusive jurisdiction over LuxeYard's claims against him, thereby depriving the trial court of subject-matter jurisdiction. Under the Securities Exchange Act of 1934 ("the Act"), federal courts "have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder." 15 U.S.C. § 78aa(a). The United States Supreme Court has interpreted the Act's exclusive-jurisdiction provision to apply to state-law claims only in the rare instances in which a federal issue under the Act is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258, 133 S. Ct. 1059, 1065, 185 L. Ed. 2d 72 (2013). We need not address all of these elements; it is sufficient to point out that LuxeYard's allegations against Klinek raise no federal issue under the Act that qualifies as "substantial," as the term is used in the test.

Substantiality is measured by "the importance of the issue to the federal system as a whole." *Id.*, at 260, 125 S. Ct. at 1066, 185 L. Ed. 2d 72. But LuxeYard's allegations presented the "fact-bound and situation-specific"[16] question of whether Klinek participated in securities violations in furtherance of a conspiracy for Casey to breach his fiduciary duties to LuxeYard. That is a state common-law claim, and a state court's resolution of the claim is not significant to the federal system as a whole. *See Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 383 n.7, 116 S. Ct.

---

[16] *Gunn*, 568 U.S. at 263, 133 S. Ct. at 1068, 185 L. Ed. 2d 72 (quoting *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 700–701, 126 S. Ct. 2121, 2137, 165 L. Ed. 2d 131 (2006)).

873, 882 n.7, 134 L. Ed. 2d 6 (1996) ("Though the plaintiff class premised one of its claims of fiduciary breach on the allegation that MCA wasted corporate assets by exposing the corporation to liability under the federal securities laws, the cause pled was nonetheless a state common-law action for breach of fiduciary duty."). Indeed, Klinek does not contend otherwise.

We conclude that the federal courts do not have exclusive jurisdiction over LuxeYard's claims against Klinek, and thus, the state court properly exercised jurisdiction.

## VI. CONCLUSION

The central question of whether a plaintiff surrenders its claims against a tortfeasor's co-conspirators by settling with the tortfeasor appears to be one of first impression, but we believe the result we have reached is consistent with the policy repeatedly emphasized by both this state's legislature and its judiciary: that the peaceable resolution of disputes through voluntary settlement is to be encouraged.

The remaining issues in the case are answered by principles equally well-settled. First, in the absence of special exceptions, we construe pleadings liberally in favor of the pleader. Second, statutes are construed in accordance with their language—and the same can be said of discovery requests and their answers. And third, when analyzing the sufficiency of the evidence, we defer to the factfinder's credibility determinations and its reasonable resolution of conflicting evidence.

Having applied these principles to the issues presented, we affirm the trial court's judgment, which we conclude the trial court had jurisdiction to render.


/s/     Tracy Christopher
        Justice


Panel consists of Justices Christopher, Jewell, and Hassan.

29